# WARDS COVE PACKING CO., INC., ET AL. *v.* ATONIO ET AL.

No. 87-1387. Argued January 18, 1989—Decided June 5, 1989

WHITE, J., delivered the opinion of the Court, in which REHNQUIST, C. J., and O'CONNOR, SCALIA, and KENNEDY, JJ., joined. BLACKMUN, J., filed a dissenting opinion, in which BRENNAN and MARSHALL, JJ., joined, *post*, p. 661. STEVENS, J., filed a dissenting opinion, in which BRENNAN, MARSHALL, and BLACKMUN, JJ., joined, *post*, p. 662.

*Douglas M. Fryer* argued the cause for petitioners. With him on the briefs were *Douglas M. Duncan* and *Richard L. Phillips.*

*Abraham A. Arditi* argued the cause and filed a brief for respondents.*

---

*Briefs of *amici curiae* urging reversal were filed for the United States by *Solicitor General Fried, Assistant Attorney General Reynolds, Deputy Assistant Attorney General Clegg, Richard G. Taranto, David K. Flynn,* and *Lisa J. Stark;* for the American Society for Personnel Administration by *Lawrence Z. Lorber* and *J. Robert Kirk;* for the Chamber of Commerce of the United States by *Glen D. Nager, Andrew M. Kramer, David A. Copus, Patricia A. Dunn,* and *Stephen A. Bokat;* and for the Equal Em-

JUSTICE WHITE delivered the opinion of the Court.

Title VII of the Civil Rights Act of 1964, 78 Stat. 253, as amended, 42 U. S. C. § 2000e *et seq.*, makes it an unfair employment practice for an employer to discriminate against any individual with respect to hiring or the terms and condition of employment because of such individual's race, color, religion, sex, or national origin; or to limit, segregate, or classify his employees in ways that would adversely affect any employee because of the employee's race, color, religion, sex, or national origin.[1] § 2000e–2(a). *Griggs* v. *Duke Power Co.*, 401 U. S. 424, 431 (1971), construed Title VII to proscribe "not only overt discrimination but also practices that are fair in form but discriminatory in practice." Under this basis for liability, which is known as the "disparate-impact" theory and which is involved in this case, a facially neutral

---

ployment Advisory Council by *Robert E. Williams, Douglas S. McDowell,* and *Edward E. Potter.*

Briefs of *amici curiae* urging affirmance were filed for the American Civil Liberties Union et al. by *Joan E. Bertin, Isabelle Katz Pinzler,* and *John A. Powell;* for the Lawyers' Committee for Civil Rights Under Law by *Nicholas DeB. Katzenbach, Alan E. Kraus, Conrad Harper, Stuart J. Land, Norman Redlich, Richard T. Seymour,* and *James C. Gray, Jr.;* for the National Association for the Advancement of Colored People by *Grover G. Hankins* and *Alfred W. Blumrosen;* and for the NAACP Legal Defense and Educational Fund, Inc., et al. by *Julius LeVonne Chambers, Charles Stephen Ralston, Ronald L. Ellis, Bill Lann Lee, Patrick O. Patterson, Jr., Theodore M. Shaw, Antonia Hernandez,* and *E. Richard Larson.*

*Clint Bolick, Jerald L. Hill,* and *Mark J. Bredemeier* filed a brief for the Center for Civil Rights as *Amicus Curiae.*

[1] Title 42 U. S. C. § 2000e–2(a), provides:

"(a) It shall be an unlawful employment practice for an employer—

"(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin; or

"(2) to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin."

employment practice may be deemed violative of Title VII without evidence of the employer's subjective intent to discriminate that is required in a "disparate-treatment" case.

I

The claims before us are disparate-impact claims, involving the employment practices of petitioners, two companies that operate salmon canneries in remote and widely separated areas of Alaska. The canneries operate only during the salmon runs in the summer months. They are inoperative and vacant for the rest of the year. In May or June of each year, a few weeks before the salmon runs begin, workers arrive and prepare the equipment and facilities for the canning operation. Most of these workers possess a variety of skills. When salmon runs are about to begin, the workers who will operate the cannery lines arrive, remain as long as there are fish to can, and then depart. The canneries are then closed down, winterized, and left vacant until the next spring. During the off-season, the companies employ only a small number of individuals at their headquarters in Seattle and Astoria, Oregon, plus some employees at the winter shipyard in Seattle.

The length and size of salmon runs vary from year to year, and hence the number of employees needed at each cannery also varies. Estimates are made as early in the winter as possible; the necessary employees are hired, and when the time comes, they are transported to the canneries. Salmon must be processed soon after they are caught, and the work during the canning season is therefore intense.[2] For this

---

[2] "Independent fishermen catch the salmon and turn them over to company-owned boats called 'tenders,' which transport the fish from the fishing grounds to the canneries. Once at the cannery, the fish are eviscerated, the eggs pulled, and they are cleaned. Then, operating at a rate of approximately four cans per second, the salmon are filled into cans. Next, the canned salmon are cooked under precise time-temperature requirements established by the FDA, and the cans are inspected to ensure

reason, and because the canneries are located in remote regions, all workers are housed at the canneries and have their meals in company-owned mess halls.

Jobs at the canneries are of two general types: "cannery jobs" on the cannery line, which are unskilled positions; and "noncannery jobs," which fall into a variety of classifications. Most noncannery jobs are classified as skilled positions.[3] Cannery jobs are filled predominantly by nonwhites: Filipinos and Alaska Natives. The Filipinos are hired through, and dispatched by, Local 37 of the International Longshoremen's and Warehousemen's Union pursuant to a hiring hall agreement with the local. The Alaska Natives primarily reside in villages near the remote cannery locations. Noncannery jobs are filled with predominantly white workers, who are hired during the winter months from the companies' offices in Washington and Oregon. Virtually all of the noncannery jobs pay more than cannery positions. The predominantly white noncannery workers and the predominantly nonwhite cannery employees live in separate dormitories and eat in separate mess halls.

In 1974, respondents, a class of nonwhite cannery workers who were (or had been) employed at the canneries, brought this Title VII action against petitioners. Respondents alleged that a variety of petitioners' hiring/promotion practices — e. g., nepotism, a rehire preference, a lack of objective hiring criteria, separate hiring channels, a practice of not promoting from within — were responsible for the racial strati-

that proper seals are maintained on the top, bottom and sides." 768 F. 2d 1120, 1123 (CA9), vacated, 787 F. 2d 462 (1985).

[3] The noncannery jobs were described as follows by the Court of Appeals: "Machinists and engineers are hired to maintain the smooth and continuous operation of the canning equipment. Quality control personnel conduct the FDA-required inspections and recordkeeping. Tenders are staffed with a crew necessary to operate the vessel. A variety of support personnel are employed to operate the entire cannery community, including, for example, cooks, carpenters, store-keepers, bookkeepers, beach gangs for dock yard labor and construction, etc." 768 F. 2d, at 1123.

fication of the work force and had denied them and other non-whites employment as noncannery workers on the basis of race. Respondents also complained of petitioners' racially segregated housing and dining facilities. All of respondents' claims were advanced under both the disparate-treatment and disparate-impact theories of Title VII liability.

The District Court held a bench trial, after which it entered 172 findings of fact. 34 EPD ¶34,437, pp. 33,822–33,836 (WD Wash. 1983). It then rejected all of respondents' disparate-treatment claims. It also rejected the disparate-impact challenges involving the subjective employment criteria used by petitioners to fill these noncannery positions, on the ground that those criteria were not subject to attack under a disparate-impact theory. *Id.*, p. 33,840. Petitioners' "objective" employment practices (*e. g.*, an English language requirement, alleged nepotism in hiring, failure to post noncannery openings, the rehire preference, etc.) were found to be subject to challenge under the disparate-impact theory, but these claims were rejected for failure of proof. Judgment was entered for petitioners.

On appeal, a panel of the Ninth Circuit affirmed, 768 F. 2d 1120 (1985), but that decision was vacated when the Court of Appeals agreed to hear the case en banc, 787 F. 2d 462 (1985). The en banc hearing was ordered to settle an intra-circuit conflict over the question whether subjective hiring practices could be analyzed under a disparate-impact model; the Court of Appeals held—as this Court subsequently ruled in *Watson* v. *Fort Worth Bank & Trust*, 487 U. S. 977 (1988)— that disparate-impact analysis could be applied to subjective hiring practices. 810 F. 2d 1477, 1482 (1987). The Ninth Circuit also concluded that in such a case, "[o]nce the plaintiff class has shown disparate impact caused by specific, identifiable employment practices or criteria, the burden shifts to the employer," *id.*, at 1485, to "prov[e the] business necessity" of the challenged practice, *id.*, at 1486. Because the en banc holding on subjective employment practices reversed

the District Court's contrary ruling, the en banc Court of Appeals remanded the case to a panel for further proceedings.

On remand, the panel applied the en banc ruling to the facts of this case. 827 F. 2d 439 (1987). It held that respondents had made out a prima facie case of disparate impact in hiring for both skilled and unskilled noncannery positions. The panel remanded the case for further proceedings, instructing the District Court that it was the employer's burden to prove that any disparate impact caused by its hiring and employment practices was justified by business necessity. Neither the en banc court nor the panel disturbed the District Court's rejection of the disparate-treatment claims.[4]

Petitioners sought review of the Court of Appeals' decision in this Court, challenging it on several grounds. Because some of the issues raised by the decision below were matters

---

[4] The fact that neither the District Court, nor the Ninth Circuit en banc, nor the subsequent Court of Appeals panel ruled for respondents on their disparate-treatment claims—*i. e.*, their allegations of intentional racial discrimination—warrants particular attention in light of the dissents' comment that the canneries "bear an unsettling resemblance to aspects of a plantation economy." *Post*, at 664, n. 4 (STEVENS, J., dissenting); *post*, at 662 (BLACKMUN, J., dissenting).

Whatever the "resemblance," the unanimous view of the lower courts in this litigation has been that respondents did not prove that the canneries practice intentional racial discrimination. Consequently, JUSTICE BLACKMUN's hyperbolic allegation that our decision in this case indicates that this Court no longer "believes that race discrimination . . . against nonwhites . . . is a problem in our society," *ibid.*, is inapt. Of course, it is unfortunately true that race discrimination exists in our country. That does not mean, however, that it exists at the canneries—or more precisely, that it has been proved to exist at the canneries.

Indeed, JUSTICE STEVENS concedes that respondents did not press before us the legal theories under which the aspects of cannery life that he finds to most resemble a "plantation economy" might be unlawful. *Post*, at 664, n. 4. Thus, the question here is not whether we "approve" of petitioners' employment practices or the society that exists at the canneries, but, rather, whether respondents have properly established that these practices violate Title VII.

on which this Court was evenly divided in *Watson* v. *Fort Worth Bank & Trust, supra,* we granted certiorari, 487 U. S. 1264 (1988), for the purpose of addressing these disputed questions of the proper application of Title VII's disparate-impact theory of liability.

## II

In holding that respondents had made out a prima facie case of disparate impact, the Court of Appeals relied solely on respondents' statistics showing a high percentage of non-white workers in the cannery jobs and a low percentage of such workers in the noncannery positions.[5] Although statistical proof can alone make out a prima facie case, see *Teamsters* v. *United States,* 431 U. S. 324, 339 (1977); *Hazelwood School Dist.* v. *United States,* 433 U. S. 299, 307–308 (1977), the Court of Appeals' ruling here misapprehends our precedents and the purposes of Title VII, and we therefore reverse.

"There can be no doubt," as there was when a similar mistaken analysis had been undertaken by the courts below in *Hazelwood, supra,* at 308, "that the . . . comparison . . . fundamentally misconceived the role of statistics in employment discrimination cases." The "proper comparison [is] between the racial composition of [the at-issue jobs] and the racial composition of the qualified . . . population in the relevant labor market." *Ibid.* It is such a comparison—between the racial composition of the qualified persons in the labor market and the persons holding at-issue jobs—that generally forms

---

[5] The parties dispute the extent to which there is a discrepancy between the percentage of nonwhites employed as cannery workers and those employed in noncannery positions. Compare, *e. g.,* Brief for Petitioners 4–9 with Brief for Respondents 4–6. The District Court made no precise numerical findings in this regard, but simply noted that there were "significant disparities between the at-issue jobs [*i. e.,* noncannery jobs] and the total workforce at the canneries" which were explained by the fact that "nearly all employed in the 'cannery worker' department are non-white." See 34 EPD ¶ 34,437, pp. 33,841, 33,829 (WD Wash. 1983).

For reasons explained below, the degree of disparity between these groups is not relevant to our decision here.

the proper basis for the initial inquiry in a disparate-impact case. Alternatively, in cases where such labor market statistics will be difficult if not impossible to ascertain, we have recognized that certain other statistics—such as measures indicating the racial composition of "otherwise-qualified applicants" for at-issue jobs—are equally probative for this purpose. See, e. g., New York City Transit Authority v. Beazer, 440 U. S. 568, 585 (1979).[6]

It is clear to us that the Court of Appeals' acceptance of the comparison between the racial composition of the cannery work force and that of the noncannery work force, as probative of a prima facie case of disparate impact in the selection of the latter group of workers, was flawed for several reasons. Most obviously, with respect to the skilled noncannery jobs at issue here, the cannery work force in no way reflected "the pool of *qualified* job applicants" or the "*qualified* population in the labor force." Measuring alleged discrimination in the selection of accountants, managers, boat captains, electricians, doctors, and engineers—and the long list of other "skilled" noncannery positions found to exist by the District Court, see 34 EPD ¶ 34,437, p. 33,832—by comparing the number of nonwhites occupying these jobs to the number of nonwhites filling cannery worker positions is nonsensical. If the absence of minorities holding such skilled positions is due to a dearth of qualified nonwhite applicants (for reasons that are not petitioners' fault),[7] petition-

---

[6] In fact, where "figures for the general population might . . . accurately reflect the pool of qualified job applicants," cf. *Teamsters* v. *United States*, 431 U. S. 324, 340, n. 20 (1977), we have even permitted plaintiffs to rest their prima facie cases on such statistics as well. See, e. g., *Dothard* v. *Rawlinson*, 433 U. S. 321, 329–330 (1977).

[7] Obviously, the analysis would be different if it were found that the dearth of qualified nonwhite applicants was due to practices on petitioners' part which—expressly or implicitly—deterred minority group members from applying for noncannery positions. See, e. g., *Teamsters* v. *United States, supra*, at 365.

ers' selection methods or employment practices cannot be said to have had a "disparate impact" on nonwhites.

One example illustrates why this must be so. Respondents' own statistics concerning the noncannery work force at one of the canneries at issue here indicate that approximately 17% of the new hires for medical jobs, and 15% of the new hires for officer worker positions, were nonwhite. See App. to Brief for Respondents B–1. If it were the case that less than 15 to 17% of the applicants for these jobs were nonwhite and that nonwhites made up a lower percentage of the relevant qualified labor market, it is hard to see how respondents, without more, cf. *Connecticut* v. *Teal*, 457 U. S. 440 (1982), would have made out a prima facie case of disparate impact. Yet, under the Court of Appeals' theory, simply because nonwhites comprise 52% of the cannery workers at the cannery in question, see App. to Brief for Respondents B–1, respondents would be successful in establishing a prima facie case of racial discrimination under Title VII.

Such a result cannot be squared with our cases or with the goals behind the statute. The Court of Appeals' theory, at the very least, would mean that any employer who had a segment of his work force that was—for some reason—racially imbalanced, could be haled into court and forced to engage in the expensive and time-consuming task of defending the "business necessity" of the methods used to select the other members of his work force. The only practicable option for many employers would be to adopt racial quotas, insuring that no portion of their work forces deviated in racial composition from the other portions thereof; this is a result that Congress expressly rejected in drafting Title VII. See 42 U. S. C. § 2000e–2(j); see also *Watson* v. *Fort Worth Bank & Trust*, 487 U. S. at 922–994, and n. 2 (opinion of O'CONNOR, J.). The Court of Appeals' theory would "leave the employer little choice . . . but to engage in a subjective quota system of employment selection. This, of course, is far from the intent of Title VII." *Albemarle Paper Co.* v. *Moody*,

422 U. S. 405, 449 (1975) (BLACKMUN, J., concurring in judgment).

The Court of Appeals also erred with respect to the unskilled noncannery positions. Racial imbalance in one segment of an employer's work force does not, without more, establish a prima facie case of disparate impact with respect to the selection of workers for the employer's other positions, even where workers for the different positions may have somewhat fungible skills (as is arguably the case for cannery and unskilled noncannery workers). As long as there are no barriers or practices deterring qualified nonwhites from applying for noncannery positions, see n. 6, *supra*, if the percentage of selected applicants who are nonwhite is not significantly less than the percentage of qualified applicants who are nonwhite, the employer's selection mechanism probably does not operate with a disparate impact on minorities.[*] Where this is the case, the percentage of nonwhite workers found in other positions in the employer's labor force is irrelevant to the question of a prima facie statistical case of disparate impact. As noted above, a contrary ruling on this point would almost inexorably lead to the use of numerical quotas in the workplace, a result that Congress and this Court have rejected repeatedly in the past.

Moreover, isolating the cannery workers as the potential "labor force" for unskilled noncannery positions is at once both too broad and too narrow in its focus. It is too broad because the vast majority of these cannery workers did not

---

[*] We qualify this conclusion—observing that it is only "probable" that there has been no disparate impact on minorities in such circumstances—because bottom-line racial balance is not a defense under Title VII. See *Connecticut* v. *Teal*, 457 U. S. 440 (1982). Thus, even if petitioners could show that the percentage of selected applicants who are nonwhite is not significantly less than the percentage of qualified applicants who are nonwhite, respondents would still have a case under Title VII, if they could prove that some particular hiring practice has a disparate impact on minorities, notwithstanding the bottom-line racial balance in petitioners' work force. See *Teal, supra,* at 450.

seek jobs in unskilled noncannery positions; there is no show-ing that many of them would have done so even if none of the arguably "deterring" practices existed. Thus, the pool of cannery workers cannot be used as a surrogate for the class of qualified job applicants because it contains many persons who have not (and would not) be noncannery job applicants. Conversely, if respondents propose to use the cannery work-ers for comparison purposes because they represent the "qualified labor population" generally, the group is too nar-row because there are obviously many qualified persons in the labor market for noncannery jobs who are not cannery workers.

The peculiar facts of this case further illustrate why a com-parison between the percentage of nonwhite cannery work-ers and nonwhite noncannery workers is an improper basis for making out a claim of disparate impact. Here, the Dis-trict Court found that nonwhites were "overrepresent[ed]" among cannery workers because petitioners had contracted with a predominantly nonwhite union (local 37) to fill these positions. See 34 EPD ¶ 33,437, p. 33,829. As a result, if petitioners (for some permissible reason) ceased using local 37 as its hiring channel for cannery positions, it appears (ac-cording to the District Court's findings) that the racial strati-fication between the cannery and noncannery workers might diminish to statistical insignificance. Under the Court of Appeals' approach, therefore, it is possible that *with no change whatsoever* in their hiring practices for noncannery workers—the jobs at issue in this lawsuit—petitioners could make respondents' prima facie case of disparate impact "dis-appear." But *if* there would be no prima facie case of dispar-ate impact in the selection of noncannery workers absent petitioners' use of local 37 to hire cannery workers, surely pe-titioners' reliance on the union to fill the cannery jobs not at issue here (and its resulting "overrepresentation" of non-whites in those positions) does not—standing alone—make out a prima facie case of disparate impact. Yet it is precisely

such an ironic result that the Court of Appeals reached below.

Consequently, we reverse the Court of Appeals' ruling that a comparison between the percentage of cannery workers who are nonwhite and the percentage of noncannery workers who are nonwhite makes out a prima facie case of disparate impact. Of course, this leaves unresolved whether the record made in the District Court will support a conclusion that a prima facie case of disparate impact has been established on some basis other than the racial disparity between cannery and noncannery workers. This is an issue that the Court of Appeals or the District Court should address in the first instance.

## III

Since the statistical disparity relied on by the Court of Appeals did not suffice to make out a prima facie case, any inquiry by us into whether the specific challenged employment practices of petitioners caused that disparity is pretermitted, as is any inquiry into whether the disparate impact that any employment practice may have had was justified by business considerations.[9] Because we remand for further proceedings, however, on whether a prima facie case of disparate impact has been made in defensible fashion in this case, we address two other challenges petitioners have made to the decision of the Court of Appeals.

---

[9] As we understand the opinions below, the specific employment practices were challenged only insofar as they were claimed to have been responsible for the overall disparity between the number of minority cannery and noncannery workers. The Court of Appeals did not purport to hold that any specified employment practice produced its own disparate impact that was actionable under Title VII. This is not to say that a specific practice, such as nepotism, if it were proved to exist, could not itself be subject to challenge if it had a disparate impact on minorities. Nor is it to say that segregated dormitories and eating facilities in the workplace may not be challenged under 42 U. S. C. § 2000e-2(a)(2) without showing a disparate impact on hiring or promotion.

## A

First is the question of causation in a disparate-impact case. The law in this respect was correctly stated by JUSTICE O'CONNOR's opinion last Term in *Watson* v. *Fort Worth Bank & Trust*, 487 U. S., at 994:

> "[W]e note that the plaintiff's burden in establishing a prima facie case goes beyond the need to show that there are statistical disparities in the employer's work force. The plaintiff must begin by identifying the specific employment practice that is challenged. . . . Especially in cases where an employer combines subjective criteria with the use of more rigid standardized rules or tests, the plaintiff is in our view responsible for isolating and identifying the specific employment practices that are allegedly responsible for any observed statistical disparities."

Cf. also *id.*, at 1000 (BLACKMUN, J., concurring in part and concurring in judgment).

Indeed, even the Court of Appeals—whose decision petitioners assault on this score—noted that "it is . . . essential that the practices identified by the cannery workers be linked causally with the demonstrated adverse impact." 827 F. 2d, at 445. Notwithstanding the Court of Appeals' apparent adherence to the proper inquiry, petitioners contend that that court erred by permitting respondents to make out their case by offering "only [one] set of cumulative comparative statistics as evidence of the disparate impact of each and all of [petitioners' hiring] practices." Brief for Petitioners 31.

Our disparate-impact cases have always focused on the impact of *particular* hiring practices on employment opportunities for minorities. Just as an employer cannot escape liability under Title VII by demonstrating that, "at the bottom line," his work force is racially balanced (where particular hiring practices may operate to deprive minorities of employment opportunities), see *Connecticut* v. *Teal*, 457 U. S., at

450, a Title VII plaintiff does not make out a case of disparate impact simply by showing that, "at the bottom line," there is racial *imbalance* in the work force. As a general matter, a plaintiff must demonstrate that it is the application of a specific or particular employment practice that has created the disparate impact under attack. Such a showing is an integral part of the plaintiff's prima facie case in a disparate-impact suit under Title VII.

Here, respondents have alleged that several "objective" employment practices (*e. g.*, nepotism, separate hiring channels, rehire preferences), as well as the use of "subjective decision making" to select noncannery workers, have had a disparate impact on nonwhites. Respondents base this claim on statistics that allegedly show a disproportionately low percentage of nonwhites in the at-issue positions. However, even if on remand respondents can show that nonwhites are underrepresented in the at-issue jobs in a manner that is acceptable under the standards set forth in Part II, *supra*, this alone will *not* suffice to make out a prima facie case of disparate impact. Respondents will also have to demonstrate that the disparity they complain of is the result of one or more of the employment practices that they are attacking here, specifically showing that each challenged practice has a significantly disparate impact on employment opportunities for whites and nonwhites. To hold otherwise would result in employers being potentially liable for "the myriad of innocent causes that may lead to statistical imbalances in the composition of their work forces." *Watson* v. *Fort Worth Bank & Trust, supra*, at 992.

Some will complain that this specific causation requirement is unduly burdensome on Title VII plaintiffs. But liberal civil discovery rules give plaintiffs broad access to employers' records in an effort to document their claims. Also, employers falling within the scope of the Uniform Guidelines on Employee Selection Procedures, 29 CFR § 1607.1 *et seq.* (1988),

are required to "maintain . . . records or other information which will disclose the impact which its tests and other selection procedures have upon employment opportunities of persons by identifiable race, sex, or ethnic group[s]." See § 1607.4(A). This includes records concerning "the individual components of the selection process" where there is a significant disparity in the selection rates of whites and nonwhites. See § 1607.4(C). Plaintiffs as a general matter will have the benefit of these tools to meet their burden of showing a causal link between challenged employment practices and racial imbalances in the work force; respondents presumably took full advantage of these opportunities to build their case before the trial in the District Court was held.[10]

Consequently, on remand, the courts below are instructed to require, as part of respondents' prima facie case, a demonstration that specific elements of the petitioners' hiring process have a significantly disparate impact on nonwhites.

### B

If, on remand, respondents meet the proof burdens outlined above, and establish a prima facie case of disparate impact with respect to any of petitioners' employment practices, the case will shift to any business justification petitioners offer for their use of these practices. This phase of the disparate-impact case contains two components: first, a consideration of the justifications an employer offers for his use of these practices; and second, the availability of alternative practices to achieve the same business ends, with less racial impact. See, e. g., *Albemarle Paper Co.* v. *Moody*, 422 U. S., at 425. We consider these two components in turn.

---

[10] Of course, petitioners' obligation to collect or retain any of these data may be limited by the Guidelines themselves. See 29 CFR § 1602.14(b) (1988) (exempting "seasonal" jobs from certain recordkeeping requirements).

## (1)

Though we have phrased the query differently in different cases, it is generally well established that at the justification stage of such a disparate-impact case, the dispositive issue is whether a challenged practice serves, in a significant way, the legitimate employment goals of the employer. See, e. g., *Watson* v. *Fort Worth Bank & Trust*, 487 U. S., at 997–999; *New York City Transit Authority* v. *Beazer*, 440 U. S., at 587, n. 31; *Griggs* v. *Duke Power Co.*, 401 U. S., at 432. The touchstone of this inquiry is a reasoned review of the employer's justification for his use of the challenged practice. A mere insubstantial justification in this regard will not suffice, because such a low standard of review would permit discrimination to be practiced through the use of spurious, seemingly neutral employment practices. At the same time, though, there is no requirement that the challenged practice be "essential" or "indispensable" to the employer's business for it to pass muster: this degree of scrutiny would be almost impossible for most employers to meet, and would result in a host of evils we have identified above. See *supra*, at 652–653.

In this phase, the employer carries the burden of producing evidence of a business justification for his employment practice. The burden of persuasion, however, remains with the disparate-impact plaintiff. To the extent that the Ninth Circuit held otherwise in its en banc decision in this case, see 810 F. 2d, at 1485–1486, or in the panel's decision on remand, see 827 F. 2d, at 445, 447—suggesting that the persuasion burden should shift to petitioners once respondents established a prima facie case of disparate impact—its decisions were erroneous. "[T]he ultimate burden of proving that discrimination against a protected group has been caused by a specific employment practice remains with the plaintiff *at all times*." *Watson, supra*, at 997 (O'CONNOR, J.) (emphasis added). This rule conforms with the usual method for allocating persuasion and production bur-

dens in the federal courts, see Fed. Rule Evid. 301, and more specifically, it conforms to the rule in disparate-treatment cases that the plaintiff bears the burden of disproving an employer's assertion that the adverse employment action or practice was based solely on a legitimate neutral consideration. See *Texas Dept. of Community Affairs* v. *Burdine*, 450 U. S. 248, 256–258 (1981). We acknowledge that some of our earlier decisions can be read as suggesting otherwise. See *Watson, supra,* at 1006–1008 (BLACKMUN, J., concurring in part and concurring in judgment). But to the extent that those cases speak of an employer's "burden of proof" with respect to a legitimate business justification defense, see, *e. g., Dothard* v. *Rawlinson,* 433 U. S. 321, 329 (1977), they should have been understood to mean an employer's production— but not persuasion—burden. Cf., *e. g., NLRB* v. *Transportation Management Corp.*, 462 U. S. 393, 404, n. 7 (1983). The persuasion burden here must remain with the plaintiff, for it is he who must prove that it was "because of such individual's race, color," etc., that he was denied a desired employment opportunity. See 42 U. S. C. § 2000e–2(a).

### (2)

Finally, if on remand the case reaches this point, and respondents cannot persuade the trier of fact on the question of petitioners' business necessity defense, respondents may still be able to prevail. To do so, respondents will have to persuade the factfinder that "other tests or selection devices, without a similarly undesirable racial effect, would also serve the employer's legitimate [hiring] interest[s]"; by so demonstrating, respondents would prove that "[petitioners were] using [their] tests merely as a 'pretext' for discrimination." *Albemarle Paper Co., supra,* at 425; see also *Watson,* 487 U. S., at 998 (O'CONNOR, J.); *id.,* at 1005–1006 (BLACKMUN, J., concurring in part and concurring in judgment). If respondents, having established a prima facie case, come forward with alternatives to petitioners' hiring practices that

reduce the racially disparate impact of practices currently being used, and petitioners refuse to adopt these alternatives, such a refusal would belie a claim by petitioners that their incumbent practices are being employed for nondiscriminatory reasons.

Of course, any alternative practices which respondents offer up in this respect must be equally effective as petitioners' chosen hiring procedures in achieving petitioners' legitimate employment goals. Moreover, "[f]actors such as the cost or other burdens of proposed alternative selection devices are relevant in determining whether they would be equally as effective as the challenged practice in serving the employer's legitimate business goals." *Watson, supra,* at 998 (O'CONNOR, J.). "Courts are generally less competent than employers to restructure business practices," *Furnco Construction Corp.* v. *Waters,* 438 U. S. 567, 578 (1978); consequently, the judiciary should proceed with care before mandating that an employer must adopt a plaintiff's alternative selection or hiring practice in response to a Title VII suit.

## IV

For the reasons given above, the judgment of the Court of Appeals is reversed, and the case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*

JUSTICE BLACKMUN, with whom JUSTICE BRENNAN and JUSTICE MARSHALL join, dissenting.

I fully concur in JUSTICE STEVENS' analysis of this case. Today a bare majority of the Court takes three major strides backwards in the battle against race discrimination. It reaches out to make last Term's plurality opinion in *Watson* v. *Fort Worth Bank & Trust,* 487 U. S. 977 (1988), the law, thereby upsetting the longstanding distribution of burdens of proof in Title VII disparate-impact cases. It bars the use of internal work force comparisons in the making of a prima

facie case of discrimination, even where the structure of the industry in question renders any other statistical comparison meaningless. And it requires practice-by-practice statistical proof of causation, even where, as here, such proof would be impossible.

The harshness of these results is well demonstrated by the facts of this case. The salmon industry as described by this record takes us back to a kind of overt and institutionalized discrimination we have not dealt with in years: a total residential and work environment organized on principles of racial stratification and segregation, which, as JUSTICE STEVENS points out, resembles a plantation economy. *Post*, at 664, n. 4. This industry long has been characterized by a taste for discrimination of the old-fashioned sort: a preference for hiring nonwhites to fill its lowest level positions, on the condition that they stay there. The majority's legal rulings essentially immunize these practices from attack under a Title VII disparate-impact analysis.

Sadly, this comes as no surprise. One wonders whether the majority still believes that race discrimination—or, more accurately, race discrimination against nonwhites—is a problem in our society, or even remembers that it ever was. Cf. *Richmond* v. *J. A. Croson Co.*, 488 U. S. 469 (1989).

JUSTICE STEVENS, with whom JUSTICE BRENNAN, JUSTICE MARSHALL, and JUSTICE BLACKMUN join, dissenting.

Fully 18 years ago, this Court unanimously held that Title VII of the Civil Rights Act of 1964[1] prohibits employment practices that have discriminatory effects as well as those that are intended to discriminate. *Griggs* v. *Duke Power Co.*, 401 U. S. 424 (1971). Federal courts and agencies consistently have enforced that interpretation, thus promoting our national goal of eliminating barriers that define economic opportunity not by aptitude and ability but by race, color, na-

---

[1] 78 Stat. 253, as amended, 42 U. S. C. § 2000e *et seq.*

tional origin, and other traits that are easily identified but utterly irrelevant to one's qualification for a particular job.[2] Regrettably, the Court retreats from these efforts in its review of an interlocutory judgment respecting the "peculiar facts" of this lawsuit.[3] Turning a blind eye to the meaning and purpose of Title VII, the majority's opinion perfunctorily rejects a longstanding rule of law and underestimates the probative value of evidence of a racially stratified work force.[4] I cannot join this latest sojourn into judicial activism.

[2] Title VII also bars discrimination because of religion or sex. 42 U. S. C. § 2000e–2(a). Discrimination based on other characteristics has been challenged under other statutes. See, e. g., *School Board of Nassau County* v. *Arline*, 480 U. S. 273 (1987) (determining scope of protection for handicapped schoolteacher under § 504 of the Rehabilitation Act of 1973, 87 Stat. 394, 29 U. S. C. § 794); *Newport News Shipbuilding & Dry Dock Co.* v. *EEOC*, 462 U. S. 669 (1983) (Pregnancy Discrimination Act of 1978, Pub. L. 95–555, § 1, 92 Stat. 2076, 42 U. S. C. § 2000e–(k)); *Lorillard* v. *Pons*, 434 U. S. 575 (1978) (Age Discrimination in Employment Act of 1967, 81 Stat. 602, as amended, 29 U. S. C. § 621 *et seq.*); *Corning Glass Works* v. *Brennan*, 417 U. S. 188 (1974) (Equal Pay Act of 1963, 77 Stat. 56, § 3, enacted as § 6(d) of the Fair Labor Standards Act of 1938, 29 U. S. C. § 206(d)).

[3] See *ante*, at 654. The majority purports to reverse the Court of Appeals but in fact directs the District Court to make additional findings, some of which had already been ordered by the Court of Appeals. Compare 827 F. 2d 439, 445 (CA9 1987), with *ante*, at 657–658. Furthermore, nearly half the majority's opinion is devoted to two questions not fairly raised at this point: "the question of causation in a disparate-impact case," *ante*, at 656, and the nature of the employer's defense, *ante*, at 658. Because I perceive no urgency to decide "these disputed questions," *ante*, at 650, at an interlocutory stage of such a factually complicated case, I believe the Court should have denied certiorari and allowed the District Court to make the additional findings directed by the Court of Appeals.

[4] Respondents constitute a class of present and former employees of petitioners, two Alaskan salmon canning companies. The class members, described by the parties as "nonwhite," include persons of Samoan, Chinese, Filipino, Japanese, and Alaska Native descent, all but one of whom are United States citizens. 34 EPD ¶ 34,437, pp. 33,822, 33,836–33,838 (WD Wash. 1983). Fifteen years ago they commenced this suit, alleging that petitioners engage in hiring, job assignment, housing, and messing

## I

I would have thought it superfluous to recount at this late date the development of our Title VII jurisprudence, but the majority's facile treatment of settled law necessitates such a primer. This Court initially considered the meaning of Title VII in *Griggs* v. *Duke Power Co.*, 401 U. S. 424 (1971), in which a class of utility company employees challenged the conditioning of entry into higher paying jobs upon a high school education or passage of two written tests. Despite evidence that "these two requirements operated to render ineligible a markedly disproportionate number of Negroes,"[5] the Court of Appeals had held that be-

---

practices that segregate nonwhites from whites in violation of Title VII. Evidence included this response in 1971 by a foreman to a college student's inquiry about cannery employment:

" 'We are not in a position to take many young fellows to our Bristol Bay canneries as they do not have the background for our type of employees. Our cannery labor is either Eskimo or Filipino and we do not have the facilities to mix others with these groups.'" *Id.*, at 33,836.

Some characteristics of the Alaska salmon industry described in this litigation—in particular, the segregation of housing and dining facilities and the stratification of jobs along racial and ethnic lines—bear an unsettling resemblance to aspects of a plantation economy. See generally Plantation, Town, and County, Essays on the Local History of American Slave Society 163–334 (E. Miller & E. Genovese eds. 1974). Indeed the maintenance of inferior, segregated facilities for housing and feeding nonwhite employees, see 34 EPD ¶ 34,437, pp. 33,836, 33,843–33,844, strikes me as a form of discrimination that, although it does not necessarily fit neatly into a disparate-impact or disparate-treatment mold, nonetheless violates Title VII. See generally Brief for National Association for the Advancement of Colored People as *Amicus Curiae.* Respondents, however, do not press this theory before us.

[5] This Court noted that census statistics showed that in the employer's State, North Carolina, "while 34% of white males had completed high school, only 12% of Negro males had done so. . . . Similarly, with respect to standardized tests, the EEOC in one case found that use of a battery of tests, including the Wonderlic and Bennett tests used by the Company in the instant case, resulted in 58% of whites passing the tests, as compared with only 6% of the blacks." *Griggs,* 401 U. S., at 430, n. 6.

cause there was no showing of an intent to discriminate on account of race, there was no Title VII violation. *Id.*, at 429. Chief Justice Burger's landmark opinion established that an employer may violate the statute even when acting in complete good faith without any invidious intent.[6] Focusing on § 703(a)(2),[7] he explained:

"The objective of Congress in the enactment of Title VII is plain from the language of the statute. It was to achieve equality of employment opportunities and remove barriers that have operated in the past to favor an identifiable group of white employees over other employees. Under the Act, practices, procedures, or tests neutral on their face, and even neutral in terms of intent, cannot be maintained if they operate to 'freeze' the status quo of prior discriminatory employment practices." 401 U. S., at 429–430.

The opinion in *Griggs* made it clear that a neutral practice that operates to exclude minorities is nevertheless lawful if it serves a valid business purpose. "The touchstone is business necessity," the Court stressed. *Id.*, at 431. Because "Congress directed the thrust of the Act to the *consequences* of employment practices, not simply the motivation[,] . . . Congress has placed on the employer the burden of showing

---

[6] "The Court of Appeals held that the Company had adopted the diploma and test requirements without any 'intention to discriminate against Negro employees.' We do not suggest that either the District Court or the Court of Appeals erred in examining the employer's intent; but *good intent or absence of discriminatory intent does not redeem employment procedures or testing mechanisms that operate as 'built-in headwinds' for minority groups and are unrelated to measuring job capability.*" *Id.*, at 432 (emphasis added) (citation omitted).

[7] See *id.*, at 426, n. 1. This subsection provides that "[i]t shall be an unlawful employment practice for an employer—

"(a) to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin." 42 U. S. C. § 2000e–2(a)(2).

that any given requirement must have a manifest relationship to the employment in question."[8] *Id.*, at 432 (emphasis in original). Congress has declined to act — as the Court now sees fit — to limit the reach of this "disparate-impact" theory, see *Teamsters* v. *United States*, 431 U. S. 324, 335, n. 15 (1977); indeed it has extended its application.[9] This approval lends added force to the *Griggs* holding.

The *Griggs* framework, with its focus on ostensibly neutral qualification standards, proved inapposite for analyzing an individual employee's claim, brought under § 703(a)(1),[10] that an employer intentionally discriminated on account of race.[11]

---

[8] The opinion concluded:

"Nothing in the Act precludes the use of testing or measuring procedures; obviously they are useful. What Congress has forbidden is giving these devices and mechanisms controlling force unless they are demonstrably a reasonable measure of job performance. Congress has not commanded that the less qualified be preferred over the better qualified simply because of minority origins. Far from disparaging job qualifications as such, Congress has made such qualifications the controlling factor, so that race, religion, nationality, and sex become irrelevant. *What Congress has commanded is that any tests used must measure the person for the job and not the person in the abstract."* 401 U. S., at 436 (emphasis added).

[9] Voting Rights Act Amendments of 1982, Pub. L. 97–205, 96 Stat. 131, 134, as amended, codified at 42 U. S. C. §§ 1973, 1973b (1982 ed. and Supp. V). Legislative Reports leading to 1972 amendments to Title VII also evince support for disparate-impact analysis. H. R. Rep. No. 92–238, pp. 8, 20–22 (1971); S. Rep. No. 92–415, p. 5, and n. 1 (1971); accord, *Connecticut* v. *Teal*, 457 U. S. 440, 447, n. 8 (1982). Moreover, the theory is employed to enforce fair housing and age discrimination statutes. See Note, Business Necessity in Title VIII: Importing an Employment Discrimination Doctrine into the Fair Housing Act, 54 Ford. L. Rev. 563 (1986); Note, Disparate Impact Analysis and the Age Discrimination in Employment Act, 68 Minn. L. Rev. 1038 (1984).

[10] This subsection makes it unlawful for an employer

"to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin. . . ." 42 U. S. C. § 2000e–2(a)(1).

[11] In *McDonnell Douglas Corp.* v. *Green*, 411 U. S. 792 (1973), Justice Powell explained:

The means for determining intent absent direct evidence was outlined in *McDonnell Douglas Corp.* v. *Green,* 411 U. S. 792 (1973), and *Texas Dept. of Community Affairs* v. *Burdine,* 450 U. S. 248 (1981), two opinions written by Justice Powell for unanimous Courts. In such a "disparate-treatment" case, see *Teamsters,* 431 U. S., at 335, n. 15, the plaintiff's initial burden, which is "not onerous," 450 U. S., at 253, is to establish "a prima facie case of racial discrimination," 411 U. S., at 802; that is, to create a presumption of unlawful discrimination by "eliminat[ing] the most common nondiscriminatory reasons for the plaintiff's rejection."[12] 450 U. S., at 254. "The burden then must shift to the employer to articulate some legitimate, nondiscriminatory reason for the employee's rejection." 411 U. S., at 802; see 450 U. S., at 254. Fi-

---

"*Griggs* differs from the instant case in important respects. It dealt with standardized testing devices which, however neutral on their face, operated to exclude many blacks who were capable of performing effectively in the desired positions. *Griggs* was rightly concerned that childhood deficiencies in the education and background of minority citizens, resulting from forces beyond their control, not be allowed to work a cumulative and invidious burden on such citizens for the remainder of their lives. Respondent, however, appears in different clothing. He had engaged in a seriously disruptive act against the very one from whom he now seeks employment. And petitioner does not seek his exclusion on the basis of a testing device which overstates what is necessary for competent performance, or through some sweeping disqualification of all those with any past record of unlawful behavior, however remote, insubstantial, or unrelated to applicant's personal qualifications as an employee. Petitioner assertedly rejected respondent for unlawful conduct against it and, in the absence of proof of pretext or discriminatory application of such a reason, this cannot be thought the kind of 'artificial, arbitrary, and unnecessary barriers to employment' which the Court found to be the intention of Congress to remove." *Id.,* at 806 (citations omitted).

[12] "This may be done by showing (i) that he belongs to a racial minority; (ii) that he applied and was qualified for a job for which the employer was seeking applicants; (iii) that, despite his qualifications, he was rejected; and (iv) that, after his rejection, the position remained open and the employer continued to seek applicants from persons of complainant's qualifications." *Id.,* at 802.

nally, because "Title VII does not . . . permit [the employer] to use [the employee's] conduct as a pretext for the sort of discrimination prohibited by § 703(a)(1)," the employee "must be given a full and fair opportunity to demonstrate by competent evidence that the presumptively valid reasons for his rejection were in fact a coverup for a racially discriminatory decision." 411 U. S., at 804–805; see 450 U. S., at 256. While the burdens of producing evidence thus shift, the "ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." [13] 450 U. S., at 253.

Decisions of this Court and other federal courts repeatedly have recognized that while the employer's burden in a disparate-treatment case is simply one of coming forward with evidence of legitimate business purpose, its burden in a disparate-impact case is proof of an affirmative defense of business necessity. [14] Although the majority's opinion blurs

---

[13] Although disparate impact and disparate treatment are the most prevalent modes of proving discrimination violative of Title VII, they are by no means exclusive. See generally B. Schlei & P. Grossman, Employment Discrimination Law 13–289 (2d ed. 1983) (four chapters discussing "disparate treatment," "present effects of past discrimination," "adverse impact," and "reasonable accommodation" as "categories" of discrimination). Cf. n. 4, *supra.* Moreover, either or both of the primary theories may be applied to a particular set of facts. See *Teamsters* v. *United States,* 431 U. S. 324, 336, n. 15 (1977).

[14] See *McDonnell Douglas,* 411 U. S., at 802, n. 14. See also, *e. g., Teal,* 457 U. S., at 446 ("employer must . . . demonstrate that 'any given requirement [has] a manifest relationship to the employment in question'"); *New York City Transit Authority* v. *Beazer,* 440 U. S. 568, 587 (1979) (employer "rebutted" prima facie case by "demonstration that its narcotics rule . . . 'is job related'"); *Dothard* v. *Rawlinson,* 433 U. S. 321, 329 (1977) (employer has to "prov[e] that the challenged requirements are job related"); *Albemarle Paper Co.* v. *Moody,* 422 U. S. 405, 425 (1975) (employer has "burden of proving that its tests are 'job related'"); *Griggs,* 401 U. S., at 432 (employer has "burden of showing that any given requirement must have a manifest relationship to the employment"). Court of Appeals opinions properly treating the employer's burden include *Bunch* v. *Bullard,* 795 F. 2d 384, 393–394 (CA5 1986); *Lewis* v. *Bloomsburg Mills,*

that distinction, thoughtful reflection on common-law pleading principles clarifies the fundamental differences between the two types of "burdens of proof."[15] In the ordinary civil trial, the plaintiff bears the burden of persuading the trier of fact that the defendant has harmed her. See, e. g., 2 Restatement (Second) of Torts §§ 328 A, 433 B (1965) (hereinafter Restatement). The defendant may undercut plaintiff's efforts both by confronting plaintiff's evidence during her case in chief and by submitting countervailing evidence during its own case.[16] But if the plaintiff proves the existence of the harmful act, the defendant can escape liability only by persuading the factfinder that the act was justified or excusable. See, e. g., Restatement §§ 454–461, 463–467. The plaintiff in turn may try to refute this affirmative defense. Although the burdens of producing evidence regarding the existence of harm or excuse thus shift between the plaintiff

Inc., 773 F. 2d 561, 572 (CA4 1985); Nash v. Jacksonville, 763 F. 2d 1393, 1397 (CA11 1985); Segar v. Smith, 238 U. S. App. D. C. 103, 121, 738 F. 2d 1249, 1267 (1984), cert. denied sub nom. Meese v. Segar, 471 U. S. 1115 (1985); Moore v. Hughes Helicopters, Inc., Div. of Summa Corp., 708 F. 2d 475, 481 (CA9 1983); Hawkins v. Anheuser-Busch, Inc., 697 F. 2d 810, 815 (CA8 1983); Johnson v. Uncle Ben's, Inc., 657 F. 2d 750 (CA5 1981), cert. denied, 459 U. S. 967 (1982); contra, Croker v. Boeing Co., 662 F. 2d 975, 991 (CA3 1981) (en banc). Cf. Equal Employment Opportunity Comm'n, Uniform Guidelines on Employee Selection Procedures, 29 CFR § 1607.1 et seq. (1988).

[15] See, e. g., 9 J. Wigmore, Evidence §§ 2485–2498 (J. Chadbourn rev. 1981); D. Louisell & C. Mueller, Federal Evidence §§ 65–70 (1977) (hereinafter Louisell); 21 C. Wright & K. Graham, Federal Practice and Procedure § 5122 (1977) (hereinafter Wright); J. Thayer, A Preliminary Treatise on Evidence 353–389 (1898) (hereinafter Thayer); C. Langdell, Equity Pleading 108–115 (2d ed. 1883).

[16] Cf. Thayer 357 (quoting Caldwell v. New Jersey S. B. Co., 47 N. Y. 282, 290 (1872)) ("'The burden of maintaining the affirmative of the issue, and, properly speaking, the burden of proof, remained upon the plaintiff throughout the trial; but the burden or necessity was cast upon the defendant, to relieve itself from the presumption of negligence raised by the plaintiff's evidence'").

and the defendant, the burden of proving either proposition remains throughout on the party asserting it.

In a disparate-treatment case there is no "discrimination" within the meaning of Title VII unless the employer intentionally treated the employee unfairly because of race. Therefore, the employee retains the burden of proving the existence of intent at all times. If there is direct evidence of intent, the employee may have little difficulty persuading the factfinder that discrimination has occurred. But in the likelier event that intent has to be established by inference, the employee may resort to the *McDonnell/Burdine* inquiry. In either instance, the employer may undermine the employee's evidence but has no independent burden of persuasion.

In contrast, intent plays no role in the disparate-impact inquiry. The question, rather, is whether an employment practice has a significant, adverse effect on an identifiable class of workers—regardless of the cause or motive for the practice. The employer may attempt to contradict the factual basis for this effect; that is, to prevent the employee from establishing a prima facie case. But when an employer is faced with sufficient proof of disparate impact, its only recourse is to justify the practice by explaining why it is necessary to the operation of business. Such a justification is a classic example of an affirmative defense.[17]

---

[17] Accord, Fed. Rule Civ. Proc. 8(c) ("In pleading to a preceding pleading, a party shall set forth affirmatively . . . any . . . matter constituting an avoidance or affirmative defense"). Cf. Thayer 368–369:

"An admission may, of course, end the controversy; but such an admission may be, and yet not end it; and if that be so, it is because the party making the admission sets up something that avoids the apparent effect of it . . . . When this happens, the party defending becomes, in so far, the *actor* or plaintiff. In general, he who seeks to move a court in his favor, whether as an original plaintiff whose facts are merely denied, or as a defendant, who, in admitting his adversary's contention and setting up an affirmative defence, takes the rôle of *actor (reus excipiendo fit actor)*,—must satisfy

Failing to explore the interplay between these distinct orders of proof, the Court announces that our frequent statements that the employer shoulders the burden of proof respecting business necessity "should have been understood to mean an employer's production—but not persuasion—burden." [15] *Ante*, at 660. Our opinions always have emphasized that in a disparate-impact case the employer's burden is weighty. "The touchstone," the Court said in *Griggs*, "is business necessity." 401 U. S., at 431. Later, we held that prison administrators had failed to "rebu[t] the prima facie case of discrimination by showing that the height and weight requirements are . . . essential to effective job performance," *Dothard* v. *Rawlinson*, 433 U. S. 321, 331 (1977). Cf. n. 14, *supra*. I am thus astonished to read that the "touchstone of this inquiry is a reasoned review of the employer's justification for his use of the challenged practice. . . . [T]here is no requirement that the challenged practice be . . . 'essential,'" *ante*, at 659. This casual—almost summary—rejec-

---

the court of the truth and adequacy of the grounds of his claim, both in point of fact and law."

Similarly, in suits alleging price discrimination in violation of § 2 of the Clayton Act, as amended by the Robinson Patman Act, 15 U. S. C. § 13, it is well settled that the defendant has the burden of affirmatively establishing as a defense either a cost justification, under the proviso to subsection (a), *United States* v. *Borden Co.*, 370 U. S. 460, 467 (1962), or a good-faith effort to meet a competitor's equally low price, pursuant to subsection (b), *Standard Oil Co.* v. *FTC*, 340 U. S. 231, 250 (1951).

[15] The majority's only basis for this proposition is the plurality opinion in *Watson* v. *Fort Worth Bank & Trust*, 487 U. S. 977, 997 (1988), which in turn cites no authority. As JUSTICE BLACKMUN explained in *Watson*, *id.*, at 1001–1002 (concurring in part and concurring in judgment), and as I have shown here, the assertion profoundly misapprehends the difference between disparate-impact and disparate-treatment claims.

The Court also makes passing reference to Federal Rule of Evidence 301. *Ante*, at 660. That Rule pertains only to shifting of evidentiary burdens upon establishment of a presumption and has no bearing on the substantive burdens of proof. See Louisell §§ 65–70; Wright § 5122.

tion of the statutory construction that developed in the wake of *Griggs* is most disturbing. I have always believed that the *Griggs* opinion correctly reflected the intent of the Congress that enacted Title VII. Even if I were not so persuaded, I could not join a rejection of a consistent interpretation of a federal statute. Congress frequently revisits this statutory scheme and can readily correct our mistakes if we misread its meaning. *Johnson* v. *Transportation Agency, Santa Clara Cty.*, 480 U. S. 616, 644 (1987) (STEVENS, J., concurring); *Runyon* v. *McCrary*, 427 U. S. 160, 190–192 (1976) (STEVENS, J., concurring). See *McNally* v. *United States*, 483 U. S. 350, 376 (1987) (STEVENS, J., dissenting); *Commissioner* v. *Fink*, 483 U. S. 89, 102–105 (1987) (STEVENS, J., dissenting); see also *Rodriguez de Quijas* v. *Shearson/American Express, Inc.*, 490 U. S. 477, 486 (1989) (STEVENS, J., dissenting).

Also troubling is the Court's apparent redefinition of the employees' burden of proof in a disparate-impact case. No prima facie case will be made, it declares, unless the employees "'isolat[e] and identif[y] the specific employment practices that are allegedly responsible for any observed statistical disparities.'" *Ante*, at 656 (quoting *Watson* v. *Fort Worth Bank & Trust*, 487 U. S. 977, 994 (1988) (plurality opinion)). This additional proof requirement is unwarranted.[19] It is elementary that a plaintiff cannot recover upon proof of injury alone; rather, the plaintiff must connect the injury to an act of the defendant in order to establish prima facie that the defendant is liable. *E. g.*, Restatement § 430. Although the causal link must have substance, the act

---

[19] The Solicitor General's brief *amicus curiae* on behalf of the employers agrees:

"[A] decision rule for selection may be complex: it may, for example, involve consideration of multiple factors. And certainly if the factors combine to produce a single ultimate selection decision and it is not possible to challenge each one, that decision may be challenged (and defended) as a whole." Brief for United States as *Amicus Curiae* 22 (footnote omitted).

need not constitute the sole or primary cause of the harm. §§ 431–433; cf. *Price Waterhouse* v. *Hopkins*, 490 U. S. 228 (1989). Thus in a disparate-impact case, proof of numerous questionable employment practices ought to fortify an employee's assertion that the practices caused racial disparities.[20] Ordinary principles of fairness require that Title VII actions be tried like "any lawsuit." Cf. *U. S. Postal Service Bd. of Governors* v. *Aikens*, 460 U. S. 711, 714, n. 3 (1983). The changes the majority makes today, tipping the scales in favor of employers, are not faithful to those principles.

## II

Petitioners seek reversal of the Court of Appeals and dismissal of this suit on the ground that respondents' statistical evidence failed to prove a prima facie case of discrimination. Brief for Petitioners 48. The District Court concluded "there were 'significant disparities'" between the racial composition of the cannery workers and the noncannery workers, but it "made no precise numerical findings" on this and other critical points. See *ante*, at 650, n. 5. Given this dearth of findings and the Court's newly articulated preference for individualized proof of causation, it would be manifestly unfair to consider respondents' evidence in the aggregate and deem it insufficient. Thus the Court properly rejects petitioners' request for a final judgment and remands for further determination of the strength of respondents' prima facie case. See *ante*, at 655. Even at this juncture, however, I believe that respondents' evidence deserves greater credit than the majority allows.

---

[20] The Court discounts the difficulty its causality requirement presents for employees, reasoning that they may employ "liberal civil discovery rules" to obtain the employer's statistical personnel records. *Ante*, at 657. Even assuming that this generally is true, it has no bearing in this litigation, since it is undisputed that petitioners did not preserve such records. Brief for Respondents 42–43; Reply Brief for Petitioners 18–19.

Statistical evidence of discrimination should compare the racial composition of employees in disputed jobs to that " 'of the qualified . . . population in the relevant labor market.' " *Ante,* at 650 (quoting *Hazelwood School Dist.* v. *United States,* 433 U. S. 299, 308 (1977)). That statement leaves open the definition of the qualified population and the relevant labor market. Our previous opinions, *e. g., New York City Transit Authority* v. *Beazer,* 440 U. S. 568, 584–586 (1979); *Dothard* v. *Rawlinson,* 433 U. S., at 329–330; *Albemarle Paper Co.* v. *Moody,* 422 U. S. 405, 425 (1975); *Griggs,* 401 U. S., at 426, 430, n. 6, demonstrate that in reviewing statistical evidence, a court should not strive for numerical exactitude at the expense of the needs of the particular case.

The District Court's findings of fact depict a unique industry. Canneries often are located in remote, sparsely populated areas of Alaska. 34 EPD ¶ 34,437, p. 33,825 (WD Wash. 1983). Most jobs are seasonal, with the season's length and the canneries' personnel needs varying not just year to year but day to day. *Ibid.* To fill their employment requirements, petitioners must recruit and transport many cannery workers and noncannery workers from States in the Pacific Northwest. *Id.,* at 33,828. Most cannery workers come from a union local based outside Alaska or from Native villages near the canneries. *Ibid.* Employees in the noncannery positions—the positions that are "at issue"—learn of openings by word of mouth; the jobs seldom are posted or advertised, and there is no promotion to noncannery jobs from within the cannery workers' ranks. *Id.,* at 33,827–33,828.

In general, the District Court found the at-issue jobs to require "skills," ranging from English literacy, typing, and "ability to use seam micrometers, gauges, and mechanic's hand tools" to "good health" and a driver's license.[21] *Id.,* at

---

[21] The District Court found that of more than 100 at-issue job titles, all were skilled except these 15: kitchen help, waiter/waitress, janitor, oil dock crew, night watchman, tallyman, laundry, gasman, roustabout, store help,

33,833–33,834. All cannery workers' jobs, like a handful of at-issue positions, are unskilled, and the court found that the intensity of the work during canning season precludes on-the-job training for skilled noncannery positions. *Id.*, at 33,825. It made no findings regarding the extent to which the cannery workers already are qualified for at-issue jobs: individual plaintiffs testified persuasively that they were fully qualified for such jobs,[22] but the court neither credited nor discredited this testimony. Although there are no findings concerning wage differentials, the parties seem to agree that wages for cannery workers are lower than those for noncannery workers, skilled or unskilled. The District Court found that "nearly all" cannery workers are nonwhite, while the percentage of nonwhites employed in the entire Alaska salmon canning industry "has stabilized at about 47% to 50%." *Id.*, at 33,829. The precise stratification of the work force is not described in the findings, but the parties seem to agree that the noncannery jobs are predominantly held by whites.

Petitioners contend that the relevant labor market in this case is the general population of the "'external' labor market for the jobs at issue." Brief for Petitioners 17. While they would rely on the District Court's findings in this regard, those findings are ambiguous. At one point the District Court specifies "Alaska, the Pacific Northwest, and California" as "the geographical region from which [petitioners] draw their employees," but its next finding refers to "this relevant geographical area for cannery worker, laborer, and other nonskilled jobs," 34 EPD ¶34,437, p. 33,828. There

---

stockroom help, assistant caretaker (winter watchman and watchman's assistant), machinist helper/trainee, deckhand, and apprentice carpenter/carpenter's helper. 34 EPD ¶34,437, p. 33,835.

[22] Some cannery workers later became architects, an Air Force officer, and a graduate student in public administration. Some had college training at the time they were employed in the canneries. See *id.*, at 33,837–33,838; App. 38, 52–53; Tr. 76, 951–952, 1036, 1050, 2214.

is no express finding of the relevant labor market for non-cannery jobs.

Even assuming that the District Court properly defined the relevant geographical area, its apparent assumption that the population in that area constituted the "available labor supply," *ibid.*, is not adequately founded. An undisputed requirement for employment either as a cannery or noncannery worker is availability for seasonal employment in the far reaches of Alaska. Many noncannery workers, furthermore, must be available for preseason work. *Id.*, at 33,829, 33,833–33,834. Yet the record does not identify the portion of the general population in Alaska, California, and the Pacific Northwest that would accept this type of employment.[23] This deficiency respecting a crucial job qualification diminishes the usefulness of petitioners' statistical evidence. In contrast, respondents' evidence, comparing racial compositions within the work force, identifies a pool of workers willing to work during the relevant times and familiar with the workings of the industry. Surely this is more probative than the untailored general population statistics on which petitioners focus. Cf. *Hazelwood*, 433 U. S., at 308, n. 13; *Teamsters*, 431 U. S., at 339–340, n. 20.

---

[23] The District Court's justification for use of general population statistics occurs in these findings of fact:

"119. Most of the jobs at the canneries entail migrant, seasonal labor. While as a general proposition, most people prefer full-year, fixed location employment near their homes, seasonal employment in the unique salmon industry is not comparable to most other types of migrant work, such as fruit and vegetable harvesting which, for example, may or may not involve a guaranteed wage.

"120. Thus, while census data is *[sic]* dominated by people who prefer full-year, fixed-location employment, such data is *[sic]* nevertheless appropriate in defining labor supplies for migrant, seasonal work." 34 EPD ¶ 34,437, p. 33,829.

The court's rather confusing distinction between work in the cannery industry and other "migrant, seasonal work" does not support its conclusion that the general population composes the relevant labor market.

Evidence that virtually all the employees in the major categories of at-issue jobs were white,[24] whereas about two-thirds of the cannery workers were nonwhite,[25] may not by itself suffice to establish a prima facie case of discrimination.[26] But such evidence of racial stratification puts the specific employment practices challenged by respondents into perspective. Petitioners recruit employees for at-issue jobs from outside the work force rather than from lower paying, overwhelmingly nonwhite, cannery worker positions. 34 EPD ¶ 34,437, p. 33,828–33,829. Information about availability of at-issue positions is conducted by word of mouth;[27] therefore,

---

[24] For example, from 1971 to 1980, there were 443 persons hired in the job departments labeled "machinists," "company fishing boat," and "tender" at petitioner Castle & Cooke, Inc.'s Bumble Bee cannery; only 3 of them were nonwhites. Joint Excerpt of Record 35 (Exh. 588). In the same categories at the Red Salmon cannery of petitioner Wards Cove Packing Co., Inc., 488 whites and 42 nonwhites were hired. *Id.*, at 36 (Exh. 589).

[25] The Court points out that nonwhites are "overrepresented" among the cannery workers. *Ante*, at 654. Such an imbalance will be true in any racially stratified work force; its significance becomes apparent only upon examinaton of the pattern of segregation within the work force. In the cannery industry nonwhites are concentrated in positions offering low wages and little opportunity for promotion. Absent any showing that the "underrepresentation" of whites in this stratum is the result of a barrier to access, the "overrepresentation" of nonwhites does not offend Title VII.

[26] The majority suggests that at-issue work demands the skills possessed by "accountants, managers, boat captains, electricians, doctors, and engineers." See *ante*, at 651. It is at least theoretically possible that a disproportionate number of white applicants possessed the specialized skills required by some at-issue jobs. In fact, of course, many at-issue jobs involved skills not at all comparable to these selective examples. See 34 EPD ¶ 34,437, p. 33,833–33,834. Even the District Court recognized that in a year-round employment setting, "some of the positions which this court finds to be skilled, *e. g.*, truckdriving on the beach, [would] fit into the category of jobs which require skills that are readily acquirable by persons in the general public." *Id.*, at 33,841.

[27] As the Court of Appeals explained in its remand opinion:

"Specifically, the companies sought cannery workers in Native villages and through dispatches from ILWU Local 37, thus securing a work force for the lowest paying jobs which was predominantly Alaska Native and Fili-

the maintenance of housing and mess halls that separate the largely white noncannery work force from the cannery workers, *id.*, at 33,836, 33,843–33,844, coupled with the tendency toward nepotistic hiring,[28] are obvious barriers to employment opportunities for nonwhites. Putting to one side the issue of business justifications, it would be quite wrong to conclude that these practices have no discriminatory consequence.[29] Thus I agree with the Court of Appeals, 827 F. 2d 439, 444–445 (CA9 1987), that when the District Court makes the additional findings prescribed today, it should treat the evidence of racial stratification in the work force as a significant element of respondents' prima facie case.

## III

The majority's opinion begins with recognition of the settled rule that that "a facially neutral employment practice may be deemed violative of Title VII without evidence of the employer's subjective intent to discriminate that is required in a 'disparate-treatment' case." *Ante*, at 645–646. It then departs from the body of law engendered by this disparate-

---

pino. For other departments the companies relied on informal word-of-mouth recruitment by predominantly white superintendents and foremen, who recruited primarily white employees. That such practices can cause a discriminatory impact is obvious." 827 F. 2d, at 446.

[28] The District Court found but downplayed the fact that relatives of employees are given preferential consideration. See 34 EPD ¶ 34,437, p. 33,840. But "of 349 nepotistic hires in four upper-level departments during 1970–75, 332 were of whites, 17 of nonwhites," the Court of Appeals noted. "If nepotism exists, it is by definition a practice of giving preference to relatives, and where those doing the hiring are predominantly white, the practice necessarily has an adverse impact on nonwhites." 827 F. 2d, at 445.

[29] The Court suggests that the discrepancy in economic opportunities for white and nonwhite workers does not amount to disparate impact within the meaning of Title VII unless respondents show that it is "petitioners' fault." *Ante*, at 651; see also *ante*, at 653–654. This statement distorts the disparate-impact theory, in which the critical inquiry is whether an employer's practices *operate* to discriminate. *E. g.*, *Griggs*, 401 U. S., at 431. Whether the employer intended such discrimination is irrelevant.

impact theory, reformulating the order of proof and the weight of the parties' burdens. Why the Court undertakes these unwise changes in elementary and eminently fair rules is a mystery to me.

I respectfully dissent.