**Dugger HARRIS, Plaintiff,**

v.

**Richard E. LYNG, Defendant.**

**Civ. A. No. 87–1186–LFO.**

United States District Court,
District of Columbia.

July 7, 1989.

Joseph D. Gebhardt, Dobrovir & Gebhardt, Washington, D.C., for plaintiff.

Diane M. Sullivan, U.S. Atty., Washington, D.C., for defendant.

## MEMORANDUM

OBERDORFER, District Judge.

An Order filed on May 13, 1988 granted defendant's motion for partial summary judgment in part and denied it in part for reasons to be stated in a Memorandum to be filed. Filing of that Memorandum has been postponed until decision could be reached on all the issues in the case. This Memorandum does that.

### I.

This is a Title VII race discrimination case against the Department of Agriculture. Plaintiff is employed by the Foreign Agricultural Service ("FAS") as Coordinator of the Small and Minority Business Export Program, classified under Civil Service as a GM–14 Agricultural Marketing Specialist. His principal job function is recruitment of small and minority firms for participation in FAS programs. Plaintiff is the highest ranking black employee in FAS, and the only black holding the grade of GM–14. "His job is to promote and facilitate the export of agricultural commodities produced by our country's minority and small business enterprises." Plaintiff's Proposed Findings of Fact at 1; *see also* Parties' Trial Stipulations at 8. He has never formally applied for any higher position.

Plaintiff began his career at the Department of Agriculture in 1967 as a GM–11 in the FAS as a Marketing Specialist in the Livestock and Meat Products Division. He was promoted to GM–12 several years later and served as an Assistant Agricultural Attache in Liberia from 1971–73. He was promoted to GM–13 in 1975, and was selected for his current position in 1980.

### II.

Prior to trial, which began on May 16, 1988, defendant filed a motion for partial summary judgment on three issues: (1) plaintiff's claim of discrimination for non-conversion to the Foreign Service; (2) plaintiff's claim of discrimination for non-promotion to GM–15; and (3) defendant's rejection of plaintiff's February 7, 1987 EEO complaint. For reasons stated below, defendant's motion for partial summary judgment was granted with respect to plaintiff's claims based on non-conversion to the Foreign Service and with respect to the defendant's rejection of plaintiff's February 1987 EEO complaint. Defendant's motion for partial summary judgment was denied with respect to plaintiff's non-promotion to GM–15.

Regarding plaintiff's non-conversion to the Foreign Service, defendant contended that plaintiff was not eligible to be "grandfathered" into the Foreign Service in 1981 because he did not meet the established criteria. *See* Defendant's Memorandum of Points and Authorities in Support of Motion to Dismiss, or in the Alternative for Summary Judgment ("Defendant's Mem.") at 2–5. In 1984, plaintiff did apply for lateral entry into the Foreign Service

along with 13 other GM–14s and 8 GM–13s. Plaintiff was not among the 3 GM–14s and 2 GM–13s referred for examination for the Foreign Service, and he was so notified on March 13, 1984. Although he claimed that this denial was based on race discrimination, he did not contact an EEO counselor within 30 days of this rejection as required by 29 C.F.R. § 1613.214. According to defendant, plaintiff's first contact with an EEO counselor was on November 18, 1985 and his first EEO complaint was filed February 7, 1986. Hence, defendant contended that it was entitled to partial summary judgment on this issue because plaintiff failed to file his EEO complaint within 30 days as required by 29 C.F.R. § 1613.214, and plaintiff has not presented any equitable reasons for his failure to contact an EEO counselor on a timely basis. Defendant's Mem. at 5, 10–12.

Plaintiff argued that his non-conversion claim should not be dismissed because the discrimination he experienced on this issue can be regarded as a "continuing violation" dating back to 1984. Plaintiff's Opposition to Defendant's Motion for Partial Summary Judgment ("Plaintiff's Opp.") at 19. However, defendant has proffered evidence, which plaintiff does not traverse, that there were no vacancies available for lateral entry into the Foreign Service by senior employees in 1985, 1986, or 1987, and that plaintiff hence has not established a *prima facie* case of discrimination with respect to the period from November 1985 to the present. Defendant's Mem. at 6, 12. Moreover, plaintiff did not meet the criteria to be "grandfathered" into the Foreign Service. *See* Defendant's Notice of Filing, dated May 12, 1988, including Secretary's Memorandum No. 2028, United States Department of Agriculture, dated November 18, 1980. For these reasons, defendant's motion for partial summary judgment with respect to plaintiff's non-conversion to the foreign service must be granted.

■ With respect to the second issue on which defendant sought partial summary judgment, namely, plaintiff's non-promotion to GM–15, defendant contended that it was entitled to partial summary judg-

ment because plaintiff did not apply for any GM–15 vacancies during 1983, 1984, or 1985. Defendant's Mem. at 6–7, 12–13. Plaintiff is not in a position with career ladder potential beyond the GM–14 level. *Id.*

In opposition, plaintiff contended that he was not able to apply formally for a promotion because defendant has a practice of filling GM–15 positions without using competitive merit system procedures. Plaintiff's Opp. at 2. Moreover, plaintiff contended that he would prove at trial that defendant has a consistent discriminatory policy of not promoting its black employees to GM–15. *Id.* at 3–4. Plaintiff also contended that a member of the defendant's all-white Personnel Assignments Committee ("PAC") made a racially derogatory comment to plaintiff, calling him a "black dog." *Id.* at 3–5. Plaintiff has raised sufficient disputed issues of material fact on the issue of his non-promotion to GM–15 as to preclude summary judgment for defendant on this issue.

■ The third issue on which defendant sought summary judgment concerned plaintiff's EEO complaint of February 4, 1987. In that complaint, plaintiff alleged that the promotion of Mr. Robert Svec to the Senior Foreign Service, the merit pay increase given to Lynn Abbott (plaintiff's supervisor), and plaintiff's failure to be promoted to GM–15 or converted to the Foreign Service constituted race discrimination and retaliation for his prior EEO activity. *Id.* at 7, 14. The agency declined to accept this complaint on the basis of plaintiff's failure to state a claim. 29 C.F.R. §§ 1613.212, 1613.215. Defendant moved for summary judgment on the same grounds.

In opposition, plaintiff argued that his claim based on defendant's rejection of his administrative complaint of February 1987 should not be dismissed. Plaintiff contended that his administrative complaint was timely, and properly raised his race discrimination claims for non-conversion to the Foreign Service. Plaintiff's Opp. at 14–18.

Defendant's motion for partial summary judgment with respect to the rejection of

plaintiff's February 1987 EEO complaint must be granted. Defendant has proffered uncontroverted evidence that plaintiff's superiors, Mr. Svec and Mr. Abbott, are Foreign Service officers whose promotions were handled by a Selection Board. Plaintiff, as a civil service employee, is not rated and ranked by that Selection Board so there was no relation between their promotions and his situation. Finally, defendant has proffered uncontroverted evidence that plaintiff's allegations of non-promotion and non-conversion to the Foreign Service "set forth identical matters" contained in previous complaints filed by plaintiff pending or decided by the agency. 29 C.F.R. § 1613.215. *See* Defendant's Mem. at 15.

### III.

Summary disposition of the issues raised by defendant's rejection of plaintiff's application to take an examination to transfer to the Foreign Service and the rejection of plaintiff's February 7, 1987 EEO complaint left for trial plaintiff's claims of discrimination because he was not promoted to GM–15, received lower performance ratings than similarly situated white employees, and suffered retaliation for filing grievances. The trial of these issues required examination of complex inter-personal relations at FAS as and after it installed the Foreign Service personnel system parallel to the pre-existing Civil Service system.

Until 1980 all FAS employees were under the federal Civil Service personnel system. Pursuant to authority contained in the Foreign Service Act of 1980, the Secretary of Agriculture installed the Foreign Service personnel system at FAS, and established procedures for conversion of pre–1980 FAS officers into the Foreign Service at the employee's option. These special procedures were required because the Civil Service and the Foreign Service used different personnel promotion systems. The Civil Service system established particular positions at particular grades. An employee's promotion involved his or her accession to a vacancy at a higher grade; a vacancy was a predicate to promotion. Strict Civil Service regulations gave substantial protection against demotions or discharge before re-tirement. By contrast, promotion in the career Foreign Service was supposed to be on an individual basis. The relatively better performing employees were to be promoted each year, and those who did not perform as well were supposed to be selected out. Foreign Service officers are expected to serve half of their career overseas, and may not serve more than 8 years in Washington or more than 15 years overseas at any one time.

The conversion mechanism gave FAS employees who held a grade of GM–12 or less an option to transfer into the Foreign Service. Higher level employees competed for the opportunity to transfer from Civil Service to Foreign Service. Transfer to the Foreign Service exposed the employee to a risk of mandatory early retirement not present in the Civil Service system. On the other hand, although not originally noticed when the Foreign Service personnel system was superimposed on the FAS Civil Service personnel system, vacancies in the higher reaches of the Civil Service system could be filled without announcement by Foreign Service officers returning from overseas, thus reducing the opportunities of Civil Service employees for promotion to GM–14 and GM–15 vacancies.

At the time of the introduction of the Foreign Service option, four black FAS employees were grandfathered into positions for which their super grade Civil Service positions qualified them. Since 1982, six black FAS employees not in the super grade category applied for lateral entry into the Foreign Service; four of these black employees were recommended to take the examination for transfer. Plaintiff applied, and was not among those recommended. Plaintiff here claims that, by refusing to allow his conversion to the Foreign Service and by failing to promote him to GM–15, defendant has discriminated against him on the basis of his race in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e–2(a), and that defendant is liable under "disparate impact" and "disparate treatment" theories.

## A.

■ To prove a *prima facie* case of disparate impact, plaintiff must show that a facially neutral system of personnel practices has a disparate impact on black employees. *Griggs v. Duke Power Co.*, 401 U.S. 424, 431–32, 91 S.Ct. 849, 853–54, 28 L.Ed.2d 158 (1971). The Supreme Court recently clarified the criteria required for making out a *prima facie* case through statistical proof: "The 'proper comparison [is] between the racial composition of [the at-issue jobs] and the racial composition of the qualified ... population in the relevant labor market.'" *Wards Cove Packing Company v. Atonio*, — U.S. —, —, 109 S.Ct. 2115, 2121, 104 L.Ed.2d 733 (1989) (*quoting Hazelwood School District v. United States*, 433 U.S. 299, 307–08, 97 S.Ct. 2736, 2741–42, 53 L.Ed.2d 768 (1977)).

Plaintiff's *prima facie* case includes the facts that FAS has no black employees at its highest grade of GM–15, that no black employee has authority to give performance appraisals to other FAS employees, and that no black has been promoted to GM–14 since plaintiff received his appointment in 1980. By contrast, in the last three years, FAS has appointed 23 white employees to GM–14 and GM–15 positions. The evidence further shows that only one black Foreign Service officer has been assigned to a senior level position in Washington, D.C., while 53 white Foreign Service employees have been stationed here, and that in 1985, FAS had 51 whites and 5 blacks at the GM–13 level, 53 whites and 1 black at the GM–14 level, and 26 whites and 0 blacks at the GM–15 level. Parties' Trial Stipulations at ¶ 21. Plaintiff here fails to reference the number of black candidates who were qualified or applied for these positions. *See Wards Cove, supra* — U.S. at —, 109 S.Ct. at 2121.

The statistical proof includes the following: Since 1982, six blacks have applied for lateral entry into the Foreign Service; two were not recommended by the rating and ranking panels to take the written and oral examination. By comparison, there have been 151 whites who have applied; 47 whites were not recommended. This comparison reveals that approximately one-third of the applicants from each group, white and black, were not recommended.

The Supreme Court has recognized that there is no requirement that a statistical showing of disproportionate impact must always be based on analysis of the characteristics of the actual applicants. *See Wards Cove, supra* at — n. 4, 109 S.Ct. at 2120 n. 4; *Dothard v. Rawlinson*, 433 U.S. 321, 330, 97 S.Ct. 2720, 2727, 53 L.Ed.2d 786 (1977). The Court in *Dothard* stated: "The application process itself might not adequately reflect the actual potential applicant pool, since otherwise qualified people might be discouraged from applying because of a self-recognized inability to meet the very standards challenged as being discriminatory." *Dothard* at 330, 97 S.Ct. at 2727; *see also International Brotherhood of Teamsters v. United States*, 431 U.S. 324, 365–67, 97 S.Ct. 1843, 1869–71, 52 L.Ed.2d 396 (1977). However, a nonapplicant must show that he was a potential victim of unlawful discrimination. *Teamsters*, 431 U.S. at 367, 97 S.Ct. at 1870. In that regard, to show that some discriminatory policy of a company was communicated to the company's minority employees is insufficient. "The known prospect of discriminatory rejection shows only that employees who wanted [certain] jobs may have been deterred from applying to them. It does not show which of the nonapplicants actually wanted such jobs, or which possessed the requisite qualifications." *Id.* at 369, 97 S.Ct. at 1872. To show potential discrimination against nonapplicants, plaintiff must show which of the nonapplicant blacks actually wanted such jobs in the Foreign Service or the Civil Service, or which possessed the requisite qualifications. There are differences between Civil Service and Foreign Service positions, however, and the desirability of the latter is not so self-evident as to warrant a conclusion that all employees would prefer to be Foreign Service officers if given the choice. Specifically, job security incident to Civil Service positions is not available to foreign service employees. Plaintiff has failed to satisfy his burden of proof in this respect, nor has he shown

evidence of discrimination in entering the Foreign Service.

Furthermore, a Title VII plaintiff does not make out a *prima facie* case of disparate impact "simply by showing that, 'at the bottom line,' there is racial *imbalance* in the work force. As a general matter, a plaintiff must demonstrate that it is the application of a specific or particular employment practice that has created the disparate impact under attack. Such a showing is an integral part of the plaintiff's *prima facie* case in a disparate-impact suit under Title VII." *Wards Cove* —— U.S. at ——, 109 S.Ct. at 2124 (emphasis in original). Plaintiff here challenges the role of the PAC, which he characterizes as "a subjective decisionmaking body," and the agency's decision to reserve certain positions for Foreign Service officers returning from overseas as having a disparate impact on the promotion of black employees to the higher levels of the FAS. *See Watson v. Ft. Worth Bank and Trust*, 487 U.S. ——, 108 S.Ct. 2777, 2786, 101 L.Ed.2d 827 (1988) (disparate impact analysis applied to subjective employment criteria as well as to objective or standardized tests). The PAC is composed of the Administrator of the FAS and all Associate and Assistant Administrators. In the 20 years plaintiff has been at FAS, no black employee has been appointed to serve as a regular member of the PAC; no black employee has been an associate or assistant administrator. Parties' Trial Stipulations at ¶ 15, 16. There is substantial substance to plaintiff's concerns about the all-white PAC, and the Department may wish to permanently reconstitute the PAC to reflect some of these concerns.[1]

Nevertheless, despite the potential for racial discrimination by the all-white PAC, plaintiff has failed to show the necessary causal connection between the PAC's actions and any claimed discrimination. *See Wards Cove, supra* —— U.S. at ——, 109 S.Ct. at 2121. The PAC does not select individuals for promotion in either the Civil Service or the Foreign Service, but only recommends to an FAS Administrator approval of decisions of supervisors in the Civil Service and Selection Boards in the Foreign Service. The PAC does recommend to the Administrator matches for the assignment of Foreign Service personnel overseas and their reassignment to Foreign Service designated posts in Washington. But these posts are no longer available for competition among Civil Service employees. Plaintiff claims that as a result of the PAC's control over promotions and selections for high level positions at the FAS in Washington, D.C., he has been denied promotion to Grade 15. However, as defendant points out, the reassignment process has diminished the promotion opportunities of white Civil Service employees as well as black Civil Service employees so that the effective discrimination, if any, is not against black employees, but against Civil Service Employees.

In any event, defendant has offered several non-discriminatory explanations for its failure to promote plaintiff to GM–15 and for its use of these practices. According to defendant, when plaintiff applied for lateral entry into the Foreign Service his application was "accepted and rated and ranked with other GM–14's who applied. He was not ranked high enough to qualify for examination." Defendant's Pretrial Brief at 8. The other black GM–14's applied for lateral entry, qualified for examination, passed it and are now in the Foreign Service.

As to defendant's practice of providing berths to high ranking Foreign Service officers returning from overseas assignments, as a result of the expectation that Foreign Service officers will rotate to and from overseas assignments, FAS has given priority consideration to filling positions with Foreign Service personnel in Washington before giving consideration to reassignment of Civil Service employees or to announcement of positions open to Civil Service competition. While it is undisputed that positions for which plaintiff was eligible were filled without being advertised, at

---

**1.** On June 16, 1989, defendant made a black female a temporary member of the PAC. *See*

Defendant's Supplemental Filing of June 27, 1989 at 4–5.

the trial defendant offered detailed explanations for its failure to advertise these positions and further testimony that even if the positions had been advertised and plaintiff had applied, he would have been rejected.

For example, the position of Director of the High Value Products Division was held at one time by William Scholz, a Foreign Service Officer with the grade of FO–1. The position was classified for Civil Service purposes as GM–15 and is a Foreign Service position. When Scholz left, Jimmy Minyard, Assistant Administrator for Commodity and Marketing Programs, without announcement, detailed Robert Wicks as Acting Division Director. At the completion of the detail, his position was announced as "temporary." Wicks accepted a reduction from GM–15 to GM–14, thereby becoming eligible for lateral entry into the Foreign Service as an FO–2. He was subsequently promoted to FO–1, thereby achieving permanent status as Scholz's successor. Defendant contends that Wicks was selected for the detail and temporary promotion because he had the most relevant supervisory and management experience both in Washington and abroad, and as Branch Chief of Program Development he was managing the largest program area with the largest budget within the Division. According to defendant, plaintiff was not eligible for this position because he was not in the Foreign Service. Defendant makes the added point that, according to Minyard, even if plaintiff had applied he would not have been selected for the position because of his difficulty with working with others. Plaintiff himself was unable to identify at trial any significant expansion of markets attributable to his services. In addition, according to Minyard, plaintiff had never prepared or implemented a regional or country market oriented promotion program in his own area and had limited managerial experience.

Another vacancy, as Division Director, was filled without advertisement by Lynn Abbott, a Foreign Service officer, reassigned to Washington from overseas. In addition, defendant filled two Deputy Director positions without advertisement or any opportunity for plaintiff or any other Civil Service employee to apply. Defendant explains these assignments by reference to the FAS policy of holding such positions open to provide berths for FAS Foreign Service employees returning from overseas assignments. Defendant's Proposed Findings of Fact at 9–10.

Defendant filled an additional overseas Trade Officer position without advertisement, and hence, without affording plaintiff an opportunity to apply, by hiring Robert Fondahn from the private sector as authorized by the Trade Act of 1974. According to defendant, the Trade Act authorizes FAS to hire trade experts from the private sector without Civil Service competition and authorizes, but does not require, competition at the GM–15 level. Again, defendant contended that if selection of Fondahn as Trade Officer was error, it was harmless error because, if defendant had not hired Fondahn, it would have assigned a Foreign Service officer to the post. Defendant's Proposed Findings of Fact at 10.

Defendant further explains the disparity between the large number of whites and the small number of blacks in high level positions in part because few blacks apply for these positions. Defendant points particularly to plaintiff's failure to apply for any of the competitive vacancy announcements at the GM–15 level. "[T]he ultimate burden of proving that discrimination against a protected group has been caused by a specific employment practice remains with the plaintiff *at all times.*" *Wards Cove* at ——, 109 S.Ct. at 2126 (*quoting Watson v. Fort Worth Bank & Trust Co.,* 487 U.S. at ——, 108 S.Ct. at 2784) (emphasis in original). While plaintiff argues that the facially neutral system that filtered high ranking Foreign Service employees into the GM–15 vacancies that would otherwise be available to plaintiff precluded his promotion opportunity, he has nevertheless failed to establish by a preponderance of the evidence that he was qualified for and should have been promoted to a vacancy, or that he was a potential victim of unlawful discrimination.

### B.

■ As to a claim of disparate treatment, the Supreme Court has held that the factual inquiry is whether "the defendant intentionally discriminated against the plaintiff." *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 253, 101 S.Ct. 1089, 1093, 67 L.Ed.2d 207 (1981). Plaintiff here claims that he received lower performance ratings than similarly situated white employees, and suffered retaliation for filing grievances. Plaintiff offers as evidence to support his *prima facie* case of disparate treatment with respect to performance ratings the fact that in the 1984–85 rating period the performance ratings given to him and to black colleagues ranged from 3.0 to 4.0 whereas the ratings of his white colleagues ranged from 4.0 to 5.0. In the 1984–85 and 1985–86 rating periods, the function of recruitment of small and minority firms was not designated as a critical element in performance ratings. Plaintiff charges that his 1984–85 and 1985–86 appraisals are racially discriminatory, and that the deletion of his critical performance element of recruitment of small and minority firms in the 1984–85 rating cycle demonstrates a racial animus towards him. By contrast, in 1987 plaintiff's principal function was restored as a critical element in plaintiff's performance rating along with preparation of monitoring of annual marketing plans. With these factors restored, plaintiff's new supervisor determined that plaintiff's performance for 1986–87 "exceeds fully acceptable", the highest rating possible.

As evidence of a *prima facie* case of retaliation plaintiff showed that he has filed one personnel grievance and seven EEO complaints since 1984, and that most of the allegedly discriminatory actions occurred after his supervisor learned of a particular EEO complaint filed by plaintiff in November 1985. In addition to the failure of promotion and the low performance ratings, plaintiff offers as evidence of retaliation such intra-office disappointments as the moving of his office to a relatively remote and undesirable location, interdicting his efforts to help other minority employees, and exacerbation of a sexual harassment charge lodged against him by a fellow employee.

■ Plaintiff's claim that his relatively lower performance ratings stemmed from racial discrimination must fail. There is an inference of discrimination to be drawn from the disparity between the ratings of one cohort of white employees and another cohort of black employees. *See Segar v. Smith*, 738 F.2d 1249, 1265–66 (D.C.Cir. 1984). But there is no objective evidence that the tasks performed here were comparable. Moreover, with respect to the plaintiff's own performance, the testimony about it, including his own, left considerable doubt about whether he was objectively entitled to a higher rating than he was given. There were some witnesses who made generalized favorable comments about him. But the particularized evidence offered by defendant and plaintiff's own testimony on direct and cross examination failed to show that he recruited sufficient new businesses or that he sufficiently developed relationships and activities with the ones he recruited to justify higher ratings than he received. The bottom line with respect to the discriminatory rating claim is that the Department of Agriculture managers who came into office in 1980 gave a low priority to plaintiff's task—recruitment of small and minority firms. As a consequence, the Department gave a low priority to plaintiff's position. What he was doing was not as important to the incumbents as it had been to their predecessors. It was not that they discriminated in ratings against the black minority or against plaintiff because of his race. There was a policy decision as to where to concentrate resources. To the extent that minority and small business firm recruiting for which defendant was responsible was a form of affirmative action, it may be that, after 1980, FAS lowered the priority it gave to that kind of affirmative action, with the result that such recruiting was no longer a critical element in plaintiff's performance evaluation. But plaintiff has failed to demonstrate that such a decision and its impact upon plaintiff was different from what it would have been had a white employee

occupied plaintiff's position and had performed it as plaintiff was performing it.

Plaintiff's claim that he suffered retaliation for filing grievances must also fail because defendant has demonstrated nonretaliatory reasons for its alleged discriminatory actions. *See Williams v. Boorstin*, 663 F.2d 109, 116 (D.C.Cir.1980). Plaintiff claims that his office was moved from the fourth floor to the fifth floor of the Department of Agriculture's South Building from October 1984 to August 1986, making it difficult for him to receive information from the Division and to participate in activities relating to his work with the Small Business Administration. However, uncontroverted testimony established that during this time plaintiff's division lost office space to another agency as a result of a realignment of space, that plaintiff's supervisor made a judgment about which individuals did not routinely have to interact with others within the division, and that, in addition to plaintiff, one black secretary and two white employees were also moved to the fifth floor. As to plaintiff's claim that Robert Wicks encouraged black secretary Patricia Perkins to file a sexual harassment charge against plaintiff, the evidence is inadequate to prove that Wicks was retaliating against plaintiff by advising Perkins of her rights and assuring her that appropriate action could be taken to protect her against any sexual harassment.

Finally, plaintiff has made much of what he perceived as a racial slur in which he took a reference by a white colleague, William L. Davis, to "black dog" as a reference to plaintiff. The incident occurred on October 22, 1987 at an informal conference in the office of Robert J. Svec, plaintiff's then supervisor, in which plaintiff was the only black among the several employees gathered for the meeting. Defendant contends that the plaintiff misunderstood as intended for him what was in fact a reference to a picture of black dog on Svec's desk, which dog was the subject of continuing bantering between Davis and Svec. Defendant has added, however, that on that same day, Davis apologized to the FAS Administrator for the incident, and the Administrator reprimanded Davis.

Davis claimed that he attempted unsuccessfully to apologize directly to plaintiff. It was not until three months later that Davis wrote an apology to plaintiff. While the "black dog" incident does evidence an environment of racial insensitivity on the part of some white managers and acute sensitivity on the part of a black employee working in an environment where he is the only black in a meeting, it is nevertheless not actionable here.

Accordingly, an accompanying Order will direct the Clerk of the Court to enter judgment for defendant.

## ORDER

For reasons stated in an accompanying Memorandum, it is this 6th day of July, 1989, hereby

ORDERED: that the Clerk of the Court shall enter judgment for defendant.