**Dr. Chung–Chi LU, Plaintiff,**

v.

**Alan WOODS, Administrator, Agency for International Development, Defendant.**

Civ. No. 88–0795 (CRR).

United States District Court,
District of Columbia.

July 14, 1989.

Richard D. Albright, Albright & Albright, Washington, D.C., for plaintiff.

Jay B. Stephens, U.S. Atty. for the District of Columbia, John D. Bates and John Cleary, Assistant U.S. Attys., Washington D.C., for defendant.

CHARLES R. RICHEY, District Judge.

The plaintiff, Dr. Chung–Chi Lu, is a Foreign Service Officer with the Agency for International Development ("AID"). Dr. Lu was born in Taiwan, and came to the United States in 1966; at the time of Dr. Lu's emigration, he spoke no English. He now speaks English, but with a concededly heavy accent. Dr. Lu claims in this action that AID, by referring to his accent in several different employee evaluations, and by otherwise treating him in a disparate manner, has discriminated against him on the basis of national origin in violation of sections 703(a) and 717 of the Civil Rights Act of 1964, as amended (the "Act"), 42 U.S.C. §§ 2000e–2(a), 2000e–16. Dr. Lu also claims that AID has effectively retaliated against him for bringing various administrative complaints, and has thus violated section 704(a) of the Act, 42 U.S.C. § 2000e–3(a).

The Court conducted a two-day bench trial of Dr. Lu's claims on February 15–16, 1989. On the basis of the evidence adduced in that proceeding, the Court concludes that Dr. Lu has failed to prove by a preponderance of the evidence that AID intentionally discriminated against him on the basis of national origin, or that he was the object of retaliation. The Court therefore grants judgment in AID's favor.

## FACTUAL BACKGROUND AND ALLEGATIONS

Dr. Lu was born in Taiwan, and is of Chinese descent. He came to the United States in 1966, at the age of 30. He holds a Ph.D. in Agricultural Economics, obtained from Iowa State University in 1973. From 1973 to 1980, Dr. Lu held a variety of consultive and academic positions as an agricultural economist, including stints with the World Bank and the Organization of American States. Dr. Lu joined AID in 1980, working with the Agricultural and Rural Development Division of AID's Office of Technical Resources. Dr. Lu joined AID as a foreign service officer, and was transferred to Dhaka, Bangladesh in 1984. Dr. Lu was compensated at the FS–2 level upon joining AID, and has been compensated at the FS–2 level during his entire tenure with the agency.

Dr. Lu alleges in this action that his upward progress at AID since 1984 has been hindered because of his national origin. More specifically, he complains that AID officials have consistently discriminated against him in the employee evaluation process, and that this discrimination has caused him not to be promoted from FS–2 to FS–1. He alleges that AID officials have repeatedly skewed the process against him because he is Chinese, with the result of denying him the promotions and other career benefits to which he feels he is entitled.

Dr. Lu alleges that the first instance of discrimination occurred in 1985. In Dr. Lu's Employee Evaluation Report ("EER") for that year, prepared by one of his supervisors in Dhaka, Hans Peterson, Dr. Lu received a generally favorable review. The 1985 EER extolled Dr. Lu's ability to conduct multi-national operations, and noted in particular Dr. Lu's sensitive and effective management of a major joint Japanese–Bangladeshi–United States agricultural project. The 1985 EER noted Dr. Lu's Japanese language ability as a valuable skill. However, the 1985 EER also made reference to difficulties that Dr. Lu experienced with English, both oral and written. Apparently as a result of these latter refer-

ences (particularly given the otherwise positive tone of the EER) Dr. Lu's performance for 1985 was rated as "satisfactory," rather than "superior" or "outstanding." The record indicates that during the relevant period, approximately 2.5% of AID employees received ratings of "satisfactory" or below.

Dr. Lu's "satisfactory" rating for 1985 caused him to be referred to AID's Performance Standards Board ("PSB").[1] The PSB is a tribunal established to evaluate those employees deemed to be "relatively less competitive" than others in their class.[2] Such employees are referred to the PSB from AID's Selection Board, which is generally responsible for evaluating and ranking AID employees on the basis of their EERs. If an employee is referred to the PSB from the Selection Board, the PSB must make a determination as to whether the employee should be released, or, if not, whether the employee's "within grade" pay increase should be granted or denied.

The PSB that considered Dr. Lu's performance in 1985 found, "[b]ased on the limited data in the file," that Dr. Lu "only marginally" met the standards of his class. It found that "his performance has not demonstrated the program relevance and breadth which AID requires in agricultural economists." As a result, while the PSB recommended that he receive the normal

pay increase, it "strongly urge[d]" that Dr. Lu not receive tenure.[3] Dr. Lu did not receive tenure in 1985.[4]

Dr. Lu finds national origin discrimination in 1985 in two respects: (1) the reference to his English language difficulties in his 1985 EER, and (2) the fact that the PSB made a tenure recommendation, which, according to Dr. Lu, it was not authorized to do.[5] Further, he finds retaliation in the PSB's reference to the "limited data in the file." According to Dr. Lu, his file was rather bare because, pursuant to a 1984 Conciliation Agreement between AID and Dr. Lu, certain materials (past EER's) were expunged from his employee file. The Conciliation Agreement followed a 1984 suit by Dr. Lu in this Court that also alleged national origin discrimination.[6] Dr. Lu contends that the PSB's denial of tenure, to the extent that it was based on the "limited" nature of his file, effectively punishes him on account of the relief secured in the Conciliation Agreement, and thus constitutes illegal retaliation.

As for 1986, Dr. Lu again complains of references to English language problems in his EER for that year. The author of Dr. Lu's 1986 EER, Alan Hurdus, noted that "although English is not his first language, Dr. Lu is nonetheless able to communicate adequately," and that "he has some weak-

1. Dr. Lu's reference to the PSB in 1985 because of his "satisfactory" rating, and the PSB's recommendation that he not be tenured, elicited a strong letter from Hans Peterson, the author of Dr. Lu's 1985 EER. Mr. Peterson strongly condemned both the reference and the PSB's decision, and complained that both the Selection Board and the PSB had concentrated on the "satisfactory" rating to the exclusion of the more positive narrative sections of the EER. Defendant's Exhibit 36.

2. *See* Explanation of Selection Board Procedures and Ranking Report (Defendant's Exhibit 8).

3. *See* Defendant's Exhibit 33 (Memorandum to AID's Director of Personnel Management from PSB, dated January 10, 1986, regarding Dr. Lu's evaluation).

4. Dr. Lu was tenured in 1986.

5. The PSB does not have jurisdiction over tenure decisions. Instead, that responsibility lies

with the Selection Board. The *actual* decisions that the PSB may make are rather limited. From this, Dr. Lu contends that the PSB acted improperly in suggesting to the Selection Board that he not be tenured. He alleges that the PSB's improper actions give rise to an inference of national origin discrimination. AID, of course, responds by asserting that the PSB's tenure suggestion was entirely proper. For support, AID points to § 3(e) of AID Handbook 30, Supplement 3B. That subsection, in describing the duties of the PSB, provides that the PSB "shall ... submit individual statements supporting the decisions regarding those members who were deemed to have met the standards of their class." AID contends that this provision authorizes the PSB's comments regarding Dr. Lu's tenure.

6. *Lu v. McPherson,* C.A. No. 84–1803 (D.D.C. 1984).

nesses with communication skills." [7] As for Dr. Lu's written English, Hurdus stated that "[a]lthough his written materials sometimes require minor editing, his ideas are presented logically and with conviction." The reviewer for Dr. Lu's 1986 EER, Hans Peterson, in evaluating the fairness of Hurdus' review, stated that "Dr. Lu's weakness in perfect use of English, both written and verbal, has ... been noted." [8] Dr. Lu's 1986 EER rated his performance as "superior," and strongly recommended that he receive tenure. Dr. Lu did receive tenure in 1986.

Along with the references to his English language problems, however, Dr. Lu complains that his "superior" rating is inadequate when compared to the "outstanding" rating obtained in 1986 by one of Dr. Lu's colleagues in Dhaka, Kevin Rushing. In particular, Dr. Lu argues that Rushing's 1986 EER contained no review of Rushing's writing skills. According to Dr. Lu, Rushing's writing skills are, in fact, deserving of criticism. Dr. Lu sees this alleged discrepancy—the inflation of Rushing's 1986 EER alongside the deflation of Dr. Lu's 1986 EER—as reflecting discrimination on the basis of national origin.

With regard to 1987, Dr. Lu again argues that a reference to his English language skills—specifically Hurdus' comment that Dr. Lu should "continue to strengthen his writing and oral skills"—reflects national origin discrimination.[9] He also complains of the fact that while his rater, Hurdus, recommended him for promotion in 1987, his review, Peterson, did not. As a result, he was not promoted in 1987, as he thought he should have been, from FS–2 to FS–1. Dr. Lu also points to the fact that Hurdus received a letter from the Selection Board criticizing the 1987 EER that he authored for Dr. Lu as vague and nonspecific,[10] while at the same time receiving a letter commending the 1987 EER that he prepared for Kevin Rushing.[11] According to Dr. Lu, this fact reflects the animosity that AID felt toward him, an animosity that Dr. Lu alleges was based upon his national origin.

Finally, Dr. Lu contends that AID discriminated against him by virtue of its apparent unwillingness to consider him for a Washington-based assignment in the fall of 1987. By letter dated August 31, 1987, Dr. Lu requested that AID reassign him to Washington following his four-year tour of duty in Dhaka.[12] That four years would have ended in 1988. In response, David Mein, Associate Director of AID's Foreign Service Personnel Division, informed Dr. Lu by letter dated September 17, 1987, that, while his request had been "noted," "such an assignment is not consistent with [AID's] assignment practice." [13] Mr. Mein provided Dr. Lu with a copy of AID's assignment policies. These policies provide that while an employee is "eligible" for a United States assignment after four years of service, an employee "who has served continuously for four or more tours [eight years] will receive special consideration for a rotation assignment" to the United States. Dr. Lu subsequently complained that Mr. Mein's letter reflected an "erroneous" understanding of AID's assignment policies.[14] AID thereupon responded, via a letter from Janet Rourke, Acting Director of the Foreign Service Personnel Division, that while it is true that an employee may be "eligible" for a United States assignment after four years, it is AID's *practice* to withhold such an assignment until an employee has completed at least eight years of service abroad.[15]

7. *See* Defendant's Exhibit 43.

8. *Id.*

9. Dr. Lu's reviewer for the period, Hans Peterson, concurred with Hurdus' judgment, stating that "the rater correctly notes Dr. Lu's progress in communicating effectively as well as his need to continue that progress." *See* Defendant's Exhibit 48.

10. *See* Defendant's Exhibit 14.

11. *See* Defendant's Exhibit 13.

12. Defendant's Exhibit 55.

13. Defendant's Exhibit 56.

14. Defendant's Exhibit 64.

15. Defendant's Exhibit 67.

Dr. Lu complains that the Mein letter, as supplemented by the Rourke letter, reflect a summary rejection of his application for a Washington assignment, despite his "eligibility" for such an assignment after four years of service. Dr. Lu contends that this rejection was in retaliation for his having filed EEO complaints challenging his treatment over the preceding three years, and for his refusal to dismiss those complaints in return for a Washington assignment as a GS (civil service) employee. AID had offered such an assignment in exchange for a dismissal of the complaints, but Dr. Lu had rejected it because GS status, in his view, would have been harmful to his career. According to Dr. Lu, AID's rejection of his August 31 application reflected frustration with his unwillingness to abandon his EEO complaints, and therefore was retaliatory.

By way of relief for the alleged discrimination described above, Dr. Lu seeks a retroactive promotion to FS-1, an assignment in Washington, an order directing the removal of all negative comments contained in any PSB report or EER in his personnel file, and payment of all attorney's fees.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

### 1. PRIMA FACIE CASE OF NATIONAL ORIGIN DISCRIMINATION

#### A. *Disparate Impact Theory*

■ The initial question is whether Dr. Lu has established a prima facie case of national origin discrimination. In the Court's view, he has not. Some discussion of this conclusion is warranted, however, as Dr. Lu's approach, and the evidence upon which he relies, blurs somewhat the traditional analytical distinction between a disparate impact and a disparate treatment approach. More specifically, Dr. Lu seeks to surmount the prima facie hurdle by relying upon recent Supreme Court authority which permits a statistical, disparate impact analysis in challenging subjective employment procedures; such procedures had typically been challenged under the nonstatistical, disparate treatment analysis. Here, in essence, Dr. Lu seeks to challenge AID's employee evaluation and promotion process, at least at the prima facie stage, by proving that its operation has systematically prejudiced Asian Americans to a statistically significant degree.[16]

■ Dr. Lu cites *Watson v. Fort Worth Bank and Trust,* — U.S. —, 108 S.Ct. 2777, 101 L.Ed.2d 827 (1988), as "directly controlling" in this action. In *Watson,* the Court held that a disparate impact analysis may be employed in challenging subjective hiring and promotion practices. Accordingly, under *Watson,* a plaintiff may introduce evidence of statistical disparities in hiring or promotion as a means of proving a prima facie case. In reaching this result, however, a plurality of the Court noted that a "plaintiff must begin by identifying the specific employment *practice* that is challenged." *Id.,* 108 S.Ct. at 2788. Once this has been done, a plaintiff "must offer statistical evidence of a kind and degree sufficient to show that the *practice in question* has caused the exclusion of applicants ... for promotions because of their membership in a protected group." *Id.* at 2788–89. This approach, which requires a plaintiff relying upon statistical evidence to closely pin that evidence to the challenged practice—i.e., to prove *causation* with some specificity—was recently affirmed by a majority of the Court in *Wards Cove Packing Co. v. Atonio,* — U.S. —, 109 S.Ct. 2115, 2125, 104 L.Ed.2d 733 (1989) ("Respondents will also have to demonstrate that the disparity they complain of is the result of one or more of the employment practices that they are attacking here, specifically showing that *each challenged practice* has a significantly disparate impact on employment opportunities for whites and nonwhites.") (emphasis added). *Wards Cove* also confirmed what had been

---

**16.** Whether Dr. Lu denominates his challenge a disparate impact or disparate treatment case is not controlling in this circuit. Statistical evidence may be offered in this circuit to prove a prima facie case of either disparate treatment or disparate impact. *See, e.g., Palmer v. Shultz,* 815 F.2d 84, 90 (D.C.Cir.1987).

approved by only a plurality in *Watson:* that, even in a disparate impact case, "[t]he ultimate burden of proving that discrimination against a protected group has been caused by a specific employment practice remains with the plaintiff *at all times.*" *Id.,* 109 S.Ct. at 2126 (emphasis in original) (quoting *Watson,* 108 S.Ct. at 2790). Thus, the burden of *proof* never shifts to the defendant; if a plaintiff has established a prima facie case, only the burden of *production* shifts to the defendant.

In this case, Dr. Lu has offered a study prepared by an opinion witness to show the purported underrepresentation of Asian Americans in the AID workforce, as well the fact that Asian Americans were under-promoted during the relevant years in proportion to their numbers in the AID workforce.[17] Dr. Lu presumably offers this evidence as a means of establishing a prima facie case under *Watson* and *Wards Cove.* Although it is not at all clear from his pleadings or the manner in which he tried his case, Dr. Lu's heavy reliance upon *Watson* suggests that his case rests upon a disparate impact theory. However, if Dr. Lu is in fact prosecuting this action under a disparate impact theory, the Court must conclude that his statistical evidence—the means by which he has chosen to establish his prima facie case—is inadequate under *Watson* and *Wards Cove.*

Again, under both cases, a plaintiff relying upon statistical evidence of racial disparities in the workplace must closely link those disparities with the challenged hiring or promotion practices that have produced them. Here, Dr. Lu's statistical evidence addresses four issues: (1) the purported underrepresentation of Asian-Americans in AID's workforce generally; (2) the purported underrepresentation of Asian-Americans in "high ranked" positions at AID; (3) the allegedly high proportion of Asian-Americans in "low ranked" positions at AID; and (4) the allegedly "unfavorable treatment" that Asian-Americans receive from AID's Selection Board.

Dr. Lu's statistical evidence, however, as supplemented by the other evidence adduced at trial, fails to satisfy the initial burden set forth in *Watson:* that a plaintiff "begin by identifying the specific employment practice that is challenged." 108 S.Ct. at 2788. *See also Wards Cove,* 109 S.Ct. at 2124 ("As a general matter, a plaintiff must demonstrate that it is the application of a *specific or particular employment practice* that has created the disparate impact under attack.") (emphasis added). Dr. Lu's statistical evidence, even if one accepts it as wholly valid,[18] shows only that Asian-Americans may be under-represented at various levels in the AID workplace. Neither this evidence or any other evidence presented at trial clarifies the precise *practices* alleged to be responsible for this disparity across the entire AID workforce. Neither Dr. Lu himself nor his proof at trial has specified precisely what it is about AID's method of evaluating and promoting its employees that has produced the alleged disparity. The Court knows nothing of the other Asian-Americans at AID, or what it is that may have caused them to be (as alleged by Dr. Lu) excluded from the higher positions at AID. Absent such proof—proof required under *Watson* and *Wards Cove*—the Court must conclude that Dr. Lu has failed to establish a prima facie case of disparate impact. He has failed to identify a specific practice or policy responsible for the alleged disparities he has highlighted.[19]

---

17. *See* Plaintiff's Exhibit 1 (report of Dr. Lien-fu Huang, Professor of Economics, Howard University).

18. The evidence adduced at trial suggests that there may well be flaws in Dr. Lu's statistical evidence. *See* Declaration of Charles Mann (accepted as narrative testimony).

19. Other than the raw statistical information contained in Dr. Lu's expert's report—information which in no way identified a *practice* or

*procedure* utilized by AID—Dr. Lu's proof concentrated almost exclusively upon *his* EER's, and more specifically, upon the references to *his* English language problems. There was no showing, however, that the national origin discrimination of which Dr. Lu complained—references to his accent—was ever repeated. Put differently, there was no showing that the alleged disparity in the workplace borne out by Dr. Lu's statistics was a result of the *practice* or *policy* of referring to English language problems

## B. *Disparate Treatment Theory*

Alternatively, of course, the Court may treat Dr. Lu's proof as tending to prove a prima facie case of disparate *treatment* by AID in failing to promote him from FS–2 to FS–1, although Dr. Lu's approach seems not to have regarded it as such. Even here, though, Dr. Lu's proof fails.

 It is axiomatic that in establishing a prima facie case of disparate treatment, where the wrong alleged is the failure to promote a member of the protected class, the plaintiff must show at a minimum that he was *qualified* for the promotion. However, the unrebutted evidence introduced at trial—wholly apart from evidence relating to Dr. Lu's language skills—indicates that in the view of his superiors Dr. Lu simply was not prepared to assume the responsibilities associated with FS–1 status. According to Hans Peterson, Dr. Lu's rater for 1985 and his reviewer for 1986 and 1987, Dr. Lu—while a "trained, effective agricultural economist," lacked at that stage of his career certain of the analytical skills required to operate at FS–1. In particular, according to Dr. Peterson, Dr. Lu often required guidance in determining which economic "tools" were most appropriate for various situations. The ability to make such determinations on an independent, individual basis, he testified, "is the difference, in my judgment, between an officer serving at an FS–2 level and serving in a higher rank, FS–1." [20] Dr. Peterson testified that while Dr. Lu is capable of acquiring those skills with experience, he lacked them during the relevant time period. Further, Dr. Peterson testified that Dr. Lu's interpersonal skills in dealing with both his inferiors and his superiors lacked the qualities needed for promotion during the relevant time frame. [21] Accordingly,

Dr. Peterson refused to recommend that Dr. Lu be promoted in 1987, despite his rater's recommendation that he be so promoted. Dr. Peterson's testimony as to Dr. Lu's qualifications, apart from any language problems he may have had, was essentially unrebutted.

The Government offered the testimony of two other members of AID's Dhaka delegation to corroborate Dr. Peterson's testimony. Howard Kramer, the Program Officer for the Dhaka delegation during the relevant period, testified as to several instances of what he regards as Dr. Lu's marginal competence. Kramer testified that, in his view, Dr. Lu was a "relatively poor" Foreign Service Officer, [22] and that, language problems aside, he generally lacked the ability to cogently articulate the nature of his projects or their relation to the AID program as a whole. He supported this view with several anecdotes, the accuracy of which was unrebutted. John Westley, an AID officer in Dhaka who was able to observe Dr. Lu regularly, for the most part reiterated this view. [23] Both men based their opinions almost exclusively upon Dr. Lu's abilities, and *not* upon any problems that might have been caused by his problems with English. Each testified that, in his view, Dr. Lu was not qualified to serve at the FS–1 level during the relevant period. [24] Although the Court recognizes that both men are senior AID officials, and it may therefore be in their interests to testify as they did, the Court finds their testimony persuasive, and, in the absence of effective rebuttal, accords it great weight.

This testimony, coupled with the Court's review of the entire body of evidence presented at trial, convinces the Court that—language problems aside—Dr. Lu

---

among Asian Americans at AID. Dr. Lu, at most, has shown only that in one case subjective evaluations may have led to the disparate treatment of one employee. Such a showing is inadequate to support a prima facie case of disparate impact.

**20.** *See* Transcript, Vol. II at p. 64 (testimony of Hans Peterson).

**21.** *See id.* at 64.

**22.** *See* Testimony of Howard Robert Kramer at 3 (submitted in written form and affirmed under oath at trial).

**23.** *See* Testimony of John R. Westley (submitted in written narrative form and affirmed under oath at trial).

**24.** Kramer at 12; Westley at 8.

was simply not qualified for a promotion from FS–2 to FS–1 during the period of which he complains. Accordingly, the Court holds that Dr. Lu has not established a prima facie case of disparate treatment on the basis of AID's failure to so promote him between 1985 and 1987, and his claim in this regard must fail.[25]

## 2. PRIMA FACIE CASE OF RETALIATION

■ It has become settled that the concept of a "prima facie case," as derived from the alternative evidentiary burdens set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–06, 93 S.Ct. 1817, 1824–26, 36 L.Ed.2d 668 (1973), also applies to claims of retaliation under 42 U.S.C. § 2000e–3(a). *See Barnes v. Small*, 840 F.2d 972, 976 (D.C.Cir.1988). "In order to establish a prima facie case of retaliation, a plaintiff must show: (1) that [he] engaged in a statutorily protected activity; (2) that the employer took an adverse personnel action; and (3) that a causal connection existed between the two." *Id.* (quoting *McKenna v. Weinberger*, 729 F.2d 783, 790 (D.C.Cir.1984)). The latter requirement, that the plaintiff prove causation, essentially amounts to a requirement that the plaintiff prove that an employer had knowledge of the plaintiff's protected activity, and that the employer's actions were motivated, if only in part, by that knowledge.[26] *See, e.g., Davis v. State Univ. of New York*, 802 F.2d 638, 642 (2d Cir.1986) (requiring knowledge on part of employer); Schlei &

Grossman, *Employment Discrimination Law* 558–60 (2d ed. 1983). Causation (i.e., knowledge) serves as the prima facie "proxy" for discriminatory intent, which, as is the case with disparate treatment, is the *sine qua non* of a finding in favor of the plaintiff.

In this case, Dr. Lu alleges retaliation in two instances: (1) the PSB's reference in 1985 to the "limited data" in his personnel file, as an apparent result of which the PSB refused to recommend tenure; and (2) AID's refusal to grant him an assignment in Washington in 1987, alleged to be in response to his refusal to accept a Washington assignment, but at GS compensation, in return for dismissal of his then-pending EEO complaints. In the Court's view, neither claim, as elaborated at trial, states a prima facie case of discriminatory retaliation.

■ Dr. Lu's first claim, regarding the 1985 PSB comment, is moot. Dr. Lu received tenure in 1986, and the deferral of tenure from 1985 to 1986 (assuming that he was entitled to tenure in 1985) appears to have had no adverse impact upon his career. Moreover, even were the PSB's comment still at issue, the record is devoid of evidence that the members of the 1985 PSB had any knowledge or awareness of the reason for the limited contents of Dr. Lu's file.[27] Thus, the PSB's comment as to the file's limited contents can hardly be said to be in retaliation for Dr. Lu's having commenced the prior litigation.

**25.** Because the basis of the Court's conclusion (that, wholly apart from his language problems, Dr. Lu was not qualified to receive a promotion) makes clear that Dr. Lu's accent (i.e., his national origin) was not the basis of the action complained of (the failure to promote), the Court does not reach the propriety of including these references in the 1985 and 1987 EER's. The Court merely notes that the record, coupled with the Court's independent observations at trial, lend credence to the assertions contained in the EERs that Dr. Lu's accent may have hindered his professional effectiveness. In short, the Court would be prepared to find that the references in the EERs were entirely legitimate.

**26.** Motivation may be shown by a close temporal proximity between the protected activity and

an employer's adverse action. *Miller v. Fairchild Indus., Inc.,* 797 F.2d 727, 731 (9th Cir. 1986).

**27.** As noted above, a 1984 Conciliation Agreement between Dr. Lu and AID had caused certain of his previous EERs to be expunged from the file. The Court notes that Dr. Lu and his counsel each signed the Conciliation Agreement, almost certainly after negotiating its terms. Thus, Dr. Lu is as responsible as AID for the bareness of his file, if not more so. Had Dr. Lu sought a more limited form of relief in the Conciliation Agreement—for instance, expungement of only the objectionable language in the contested EERs—such an agreement would likely have been acceptable to AID and would have avoided the PSB's problem in 1985.

■ Dr. Lu's second claim of retaliation is slightly more complicated, but equally unavailing. Dr. Lu contends that AID's refusal to assign him to Washington in 1987 was based upon his unwillingness to drop his pending EEO claims in return for civil service assignment in Washington. Dr. Lu refused to accept the transfer, contingent as it was upon a conversion to the civil service, because he regarded civil service status as less attractive than foreign service. The only evidence Dr. Lu offers is a letter he received from John Chao, an AID employment official. In that letter, Dr. Lu indicated that he "understood" that AID's hostility to Dr. Lu's application was based upon Dr. Lu's unwillingness to accept the offer.[28] Other than this letter (which in any event constitutes hearsay) the record is devoid of evidence of retaliation.[29]

This letter, while supportive of Dr. Lu's contention, does not establish by a preponderance of the evidence that Dr. Lu's refusal to accept AID's offer "caused" AID to retaliate against him. Indeed, in opposition to the suggestion contained in this letter, AID marshals persuasive proof that, while Dr. Lu may have been "eligible" for a Washington assignment after four years in Dhaka, prevailing agency practice limits Washington assignments to those officers who have served at least eight years abroad.[30] Thus, the evidence suggests most strongly that, rather than any invidious, retaliatory intent, it was AID's regulations and established practice that "caused" the denial of Dr. Lu's application for a Washington assignment. The Court concedes that the matter is not entirely free from doubt, but nevertheless finds that the evidence most strongly favors the conclusion that AID did not retaliate against Dr. Lu when it rejected his application for a Washington assignment in 1987.[31] Accordingly, Dr. Lu's claim of retaliation must fail.

## CONCLUSION

The Court has considered the record, including the documentary and testimonial evidence at trial, and concludes that Dr. Lu's complaint must fail, and that judgment must be granted in favor of AID. An appropriate Order shall issue.

---

28. Plaintiff's Exhibit 43.

29. AID did not object to the introduction of this letter into evidence.

30. AID's precepts regarding rotation provide that an employee becomes "eligible" for rotation to the United States after four years of service. *See* Defendant's Exhibit 56 (attachment to letter from David Mein). However, those precepts also provide that an employee "who has served continuously overseas for four or more tours [eight years] will receive special consideration for a rotation assignment to the U.S." *Id.* AID contends that its policy, consistent with these precepts, is to permit rotation to the United States after four years in rare instances, but to generally require eight years of overseas service before permitting such a rotation. Because Dr. Lu had only 3½ years of overseas service at the time of his application, AID contends that its rejection was not only consistent with these precepts and established practice, but was indeed *required*. The Court's review of the precepts and the other evidence in the record supports AID's contention.

31. This finding also disposes of Dr. Lu's contention that this rejection constituted disparate treatment based upon national origin discrimination. If anything, this claim is weaker than his retaliation claim. The record is entirely free of evidence that, in rejecting Dr. Lu's application for a Washington assignment in 1987, AID intentionally discriminated against him on the basis of his national origin. At most, the evidence might (although the Court concludes that it does not) support an inference that the rejection was *in retaliation* for his unwillingness to dismiss his pending EEO complaints. Intentional retaliation, however, is an offense separate and apart from discrimination; it need not be accompanied by a finding that the retaliation *itself* constituted discrimination on an unlawful basis. *See, e.g., Davis v. State Univ. of New York,* 802 F.2d 638, 642 (2d Cir.1986) ("A finding of unlawful retaliation is not dependent on the merits of the underlying discrimination complaint.").