No. 69,464

In the Matter of GREGORY B. KING, *Respondent.*

(855 P.2d 963)

Opinion filed July 9, 1993.

*Stanton A. Hazlett,* deputy disciplinary administrator, argued the cause, and *Bruce E. Miller,* disciplinary administrator, was with him on the formal complaint for petitioner.

*Kenneth W. Chambers,* of Kansas City, argued the cause for respondent. *Gregory B. King,* respondent, argued the cause pro se.

*Per Curiam:* This is an original proceeding in discipline filed by the Office of the Disciplinary Administrator against Gregory B. King, an attorney admitted to the practice of law in Kansas. Two separate complaints were filed, case No. B5312 and case No. B5232, which were consolidated for hearing before the Kansas Board for the Discipline of Attorneys (Board) and this court. The facts, as determined by the hearing panel of the Board (the panel) are not disputed by respondent.

The following findings and recommendations were made by the panel:

## CASE NO. B5312

"1. [Respondent] is an attorney at law . . . .

. . . .

"2. Complainant Marlin A. Ferguson met with respondent on July 24, 1991, to discuss obtaining representation in connection with the estates of Allison and Martha Hanna, complainant's grandfather and his wife. Martha Hanna died intestate on November 18, 1990, and Allison Hanna died testate on May 8, 1991. The complainant paid respondent $100.00 on July 24, 1991, which amount was to compensate respondent for the initial office visit and was to be deducted from the retainer of $750.00 that respondent required to accept the representation. Complainant agreed to the balance of the retainer, $650.00, on July 31, 1991.

"3. On September 20, 1991, Carolyn Jimmerson, the Complainant's fiancee, contacted the respondent and told him that the complainant was now in a position to pay the remainder of the retainer. On September 24, 1991, the complainant sent the respondent a registered letter which contained the will of Allison Hanna and the death certificates of both Allison and Martha. The letter also contained a $650.00 check. That check was mistakenly de-

posited in the respondent's office account and not his trust account; shortly thereafter the office account was frozen upon the filing of an Internal Revenue Service lien.

"4. Just prior to depositing the complainant's $650.00 check, the respondent had accepted a new job with the Department of Housing and Urban Development. His supervisor told the respondent that he would not be able to maintain a private practice other than what was necessary to wind up his work in progress. The complainant was informed of these developments.

"5. The respondent took no further action to probate the estate after accepting the complainant's retainer. He also failed to keep the complainant advised of the status of the cases.

"6. Complainant Ferguson went to respondent's office on October 28, 1991, but concluded the office had been closed. Respondent denies the office had been permanently closed as of that date. In any event, complainant's efforts to contact respondent were fruitless. On November 10, 1991, the complainant's fiancee attempted to reach respondent at his home, speaking to respondent's wife. Later that day, respondent returned Carolyn Jimmerson's call. Arrangements were made for respondent to meet the complainant the next day at the public library in Kansas City, Kansas. The complainant was late for the appointment at the library and by the time he arrived the respondent had left.

"7. On November 11 the complainant went to the respondent's residence. Respondent offered no explanation for his failure to file a petition to probate the will of Allison Hanna. Respondent wrote the complainant a post-dated check for $650.00 on his office account to repay the retainer. Complainant was advised the check would not be good until November 15, 1991. Respondent did not advise complainant that the deadline for filing Allison Hanna's will was imminent or had passed.

"8. The complainant was the primary beneficiary under the will of Allison Hanna, but he is not an heir at law. Respondent failed to file the will and failed to advise complainant of the deadlines for filing wills as set forth in K.S.A. § 59-617. Subsequently, complainant's cause was taken up by a different attorney; Allison Hanna's will was admitted to probate without challenge despite the unseemly time delay.

"9. The check respondent had given to complainant was not honored by the bank. Numerous attempts to contact respondent were unsuccessful, but finally, Ms. Jimmerson reached respondent on December 20, 1991. On December 26, 1991, respondent gave complainant a cashier's check for $650.00.

"10. Respondent admits that his conduct in this matter violated MRPC 1.1 [1992 Kan. Ct. R. Annot. 244] [competence], 1.3 [1992 Kan. Ct. R. Annot. 248] [diligence], 1.4 [1992 Kan. Ct. R. Annot. 251] [communication], 1.15 [1992 Kan. Ct. R. Annot. 281] [safekeeping property], 1.16 [1992 Kan. Ct. R. Annot. 286] [declining or terminating representation], and 3.2 [1992 Kan. Ct. R. Annot. 294] [expediting litigation]. The panel concurs violations of these rules are established by clear and convincing evidence.

## CASE NO. B5232

"11. The second matter here at issue involves certain members of the Kansas City, Kansas, Chapter of the International Association of Black Professional Fire Fighters, Inc. (hereinafter "PRIDE") who believed the City and the International Association of Firefighters Local No. 64 were discriminating against African Americans and other minorities in hiring and promotion practices.

"12. In November 1986 several officers of PRIDE contacted attorney Elmer Jackson about a potential lawsuit against the City and the union based on these concerns. Their initial meeting was with Mr. Jackson and the respondent on November 26, 1986.

"13. An initial retainer of $2,000.00 was paid to Mr. Jackson on or about November 13, 1986, before PRIDE's first conference with counsel. An oral fee arrangement was concluded at the first meeting for an hourly fee of $100.00 for all time expended and for expenses.

"14. At the time of the initial meeting with the officers of PRIDE, Elmer Jackson and Gregory King shared office space and had entered into an arrangement with one another whereby King would assist Jackson in handling various matters which came to Jackson. Any fee received for such services would be split equally between Jackson and King regardless of the time expended by either.

"15. Elmer Jackson and Gregory King worked jointly on the case until their case sharing arrangement ended as the result of a fee dispute during the late spring and early summer of 1988.

"16. At the time that Jackson and King ended their working relationship, Jackson advised the officers of PRIDE that they should determine which lawyer they wanted to continue their representation. At that time the case was still in the investigatory stage. PRIDE elected to have King continue their representation. Jackson provided all the files and records he had on the matter to King.

"17. On June 14, 1988, one and one-half years after counsel was retained, PRIDE's charge of discrimination was filed with the Equal Employment Opportunity Commission (hereinafter "EEOC"). On November 21, 1989, respondent amended the EEOC charge by adding class action allegations. The EEOC closed its investigation and issued a right to sue letter on December 30, 1989.

"18. On March 5, 1990, PRIDE gave King $120.00 for a filing fee. On March 30, 1990, King filed a complaint in federal district court. The International Association of Black Professional Fire Fighters, Inc. was named as plaintiff. No individuals were named as plaintiffs. The lawsuit alleged it was brought on behalf of a class of plaintiffs and sought both monetary relief for each individual member of the class and equitable relief in the form of an injunction. Defendants named in the suit were the City of Kansas City, Kansas and the International Association of Firefighters Local No. 64. Both of the defendants were timely served and filed answers.

"19. In April of 1990, and May of 1990, both defendants served written discovery requests upon the plaintiff. Extensions of time were obtained by King to respond to the requests. Responses were eventually filed by King although after the extended due dates.

"20. On June 20, 1990, the federal court issued a Scheduling Order establishing the following deadlines: September 28, 1990, for plaintiff to identify experts; October 22, 1990, for discovery; and November 26, 1990, for the filing of dispositive motions. A discovery conference was scheduled for September 26, 1990.

"21. On August 16, 1990, the union filed a motion for partial summary judgment seeking to dismiss all claims for any individuals for back pay, front pay, lost seniority or other monetary damages upon the basis that the PRIDE organization had no standing under the law to bring such claims. The City joined in the motion on September 11, 1990.

"22. On September 26, 1990, a discovery conference was held with the court. The plaintiff was given an extension until October 19, 1990, to identify experts. Discovery was extended until January 21, 1991. Witness and exhibits lists were due January 31, 1991. Dispositive motions were required to be filed by February 25, 1991. At that conference, upon oral motion by the plaintiff's counsel and over defendants' objections, the plaintiff was given until October 15, 1990, to certify the complaint as a class action pursuant to the federal rules.

"23. On October 16, 1990, PRIDE at King's request gave him a check in the amount of $1,000.00 for witness fees. This money was to be used to secure an expert witness and for litigation expenses.

"24. On July 9, 1990, PRIDE had given respondent a list of individuals to be contacted as potential expert witnesses. Indeed, PRIDE's officers called one potential expert themselves but although King and the expert made some effort to establish contact, they were unsuccessful. The deadline of October 19, 1990, for identifying experts came and passed without respondent's filing any designation.

"25. On October 19, 1990, the federal district court issued its memorandum and order granting the defendants' motions for partial summary judgment and striking all the plaintiff's claims for monetary relief. The court's order noted that plaintiff's counsel had filed no response to the motions and the deadline had long since passed.

"26. Respondent had failed to notify PRIDE that dismissal motions had been filed against the plaintiff. PRIDE's members first learned of the motions and the court's action on them by means of a newspaper article.

"27. PRIDE scheduled a meeting with respondent for October 29, 1990, to share their growing dissatisfaction with respondent's representation and their desire to receive significant documents and keep abreast of their legal affairs.

"28. At the meeting, King assured PRIDE that he had the capability to continue their representation. He failed to produce any of the requested documents for their review at the meeting. He also failed to inform them

of the motion filed by defendants five (5) days earlier and described in the following paragraph.

"29. On October 24, 1990, the defendants filed a motion to strike class action allegations based on the failure of plaintiff's counsel to certify the complaint as a class action by the court imposed deadline of October 19, 1990. King sought and received two (2) extensions of time to respond to the motion. On January 22, 1991, he filed a response to the motion stating that the defendants had not been prejudiced by the delay and the court had an obligation of its own to certify the class.

"30. On November 19, 1990, the union and the City identified their expert witnesses. Noted in the designation was the fact that plaintiff had failed to identify any expert witnesses by the October 19, 1990, deadline.

"31. On January 22, 1991, a pretrial conference was held. Discovery in the case was continued until January 31, 1991. The deadline for filing witness and exhibit lists was extended to February 28, 1991. The deadline for dispositive motions was extended to April 1, 1991.

"32. No listing of witnesses and exhibits was ever filed by King.

"33. On May 29, 1991, the officers of PRIDE sent another letter to King stating that it had been several months since they received any written or oral communication from him. They requested a written reply as to the status of the litigation and expressed concern over a statement reportedly made by the union's president that the case would be dismissed by the court within the next thirty (30) days and he hoped the union would get back the monies spend on the litigation.

"34. The following day, May 30, 1991, the union filed its motion for summary judgment. In that motion, it alleged among other grounds, that the matter should be dismissed for the following reasons: (a) plaintiff's failure to timely file with the EEOC; (b) the lack of expert or statistical testimony or evidence; (c) the union lacked the authority to take the action requested; (d) the lack of any deposition testimony taken on behalf of the plaintiff concerning the hiring or promotion practices of the City; and (e) failure to obtain or produce any raw data or test scores in support of the claim. On June 14, 1991, the City of Kansas City, Kansas, filed a similar motion.

"35. King did not respond to the May 29, 1991, letter from PRIDE nor did he inform his client of the filing of the motion for summary judgment.

"36. On July 3, 1991, PRIDE learned that the motions for summary judgment had been filed by checking the court files. The officers of PRIDE demanded a meeting with King which occurred on July 8, 1991. On July 9, 1991, King sent a letter to PRIDE confirming part of the discussions at the July 8, 1991, meeting. That letter confirmed that both defendants had filed motions for summary judgment and set out that the options available to the plaintiff were (1) to allow the judge to rule on the motions and appeal if the motions were granted, or (2) to dismiss the case either with or without prejudice. The potential for assessment of fees if the case were dismissed with prejudice was also discussed.

"37. King still had not provided PRIDE with copies of any documents. As a result, on July 10, 1991, members of PRIDE went to the courthouse and expended $106.00 having photocopies of the case file produced. On August 1, 1991, additional costs of $9.00 were incurred in copying subsequent pleadings.

"38. On July 16, 1991, after reviewing the court file, PRIDE representatives contacted King at his home. King was told that he had gotten PRIDE into this mess and he should get it out. King replied that he would take care of it.

"39. On July 19, 1991, King filed a motion for dismissal without prejudice or in the alternative for enlargement of time to respond to summary judgment motions. The defendants filed a motion to dismiss with prejudice or the court to rule on the summary judgment motions to which King had not responded. Oral argument was set for August 26, 1991. King also filed a motion for leave to withdraw based on the concerns of PRIDE raised at the July 8, 1991, meeting with his management of the case and dissatisfaction with his services.

"40. On August 26, 1991, the court heard oral argument on the motions. The court refused to grant plaintiff a dismissal without prejudice. The court granted King's motion to withdraw and gave the plaintiff thirty (30) days to find new counsel and thirty (30) days thereafter to respond to the outstanding motions for summary judgment.

"41. On September 27, 1991, the PRIDE organization retained Bryan Nelson, who entered an appearance. After a review of the status of the case, Nelson advised PRIDE that under the existing circumstances they could not prevail at a trial on the merits. PRIDE authorized him to attempt settlement and if such could not be achieved, to dismiss the case with prejudice.

"42. Settlement negotiations in the matter were fruitless and on February 2, 1992, the court entered a memorandum and order dismissing the case with prejudice for failure to prosecute.

"43. King failed to provide PRIDE with an itemized statement for his services despite numerous requests by PRIDE. He failed to provide an itemized statement of expenses and failed to account to PRIDE for the $1,000.00 paid to him for such expenses on October 16, 1990. The only expense of litigation incurred by King was to Metropolitan Court Reporters in the amount of $2,809.90 for copies of depositions taken by the defendants. Metropolitan Court Reporters has not been paid.

"44. Respondent admits that his conduct in this matter violated MRPC 1.1, 1.2 [1992 Kan. Ct. R. Annot. 246] [scope of representation], 1.3, 1.4, 1.5 [1992 Kan. Ct. R. Annot. 254] [fees], 1.15, 3.1 [1992 Kan. Ct. R. Annot. 293] [meritorious claims and contentions], and 3.2. The panel concurs that violations of those rules have been established by clear and convincing evidence.

"45. Most of respondent's professional life has been spent with the United States Department of Housing and Urban Development, which he presently

serves as director of Fair Housing, Enforcement Division, in the office of Fair Housing and Equal Opportunity. Respondent manages a staff of investigators responsible for [pursuing] housing complaints in Iowa, Missouri, Kansas, and Nebraska. Respondent also lectures on housing discrimination law. It is not necessary that respondent hold a license to practice law in order to maintain his position with HUD.

"46. Respondent graduated from law school in 1978 and worked for public agencies, principally HUD, until February of 1984 when he essayed private practice in an office-sharing arrangement with Elmer Jackson. It appears that respondent's difficulties multiplied in mid-1988 when he and Mr. Jackson ended a case sharing relationship because of a fee dispute.

"47. King acknowledges that he accepted more work than he should have done and was overextended. Further, the PRIDE case overwhelmed and intimidated him. He had never before handled a class action. A Supreme Court decision in 1989 (*Wards Cove Packing Co. v. Atonio*, 490 U.S. 642 [1989]) rendered the PRIDE case at best very difficult and perhaps impossible to win. However, respondent had no frank conversation with his client about the improbability of success until years later when he read *Wards Cove* because it was cited in a summary judgment motion.

"48. Respondent has no prior disciplinary record.

"49. Respondent has a distinguished record of public service. He has served as chair of the Kansas City, Kansas, Human Relations Commission and as a member of the boards of The Santa Fe Trails Council of the Girl Scouts and the YMCA. He served The Kaw Valley Arts Council and Leadership 2000 and gives motivational speeches to youths.

"50. Respondent's supervisor, two peers, and two respected jurists have submitted letters in support of his character and fitness to practice law.

"51. Nonetheless, PRIDE is out of pocket a not insignificant figure, estimated by Jerhome B. Randolph to be $9,400.00, an amount that does not include the sum of $2,809.90 owed to court reporters. Further, their opportunity to have their day in court was compromised by respondent's conduct. Complainant Ferguson had to expend some considerable effort to recoup the retainer paid to respondent. Further, complainant was fortunate that circumstances permitted him to take under the Hanna will after respondent had permitted the time for filing the will to lapse.

"52. Respondent found the 'boom or bust' nature of private sole practice very difficult to manage, both practically and emotionally. While the committee is not prepared to label his conduct in these cases as self-dealing, it comes perilously close to the mark.

"53. A majority of the panel recommends that respondent be suspended from the practice of law for one year and that respondent repay to PRIDE the $2,000.00 that he received from that organization."

One panel member recommended public censure.

King did not file exceptions to the report, findings, and recommendations (with the exception of the recommended disci-

pline) as embodied in the final hearing report of the panel. King filed a written statement in which he asked this court to adopt the minority's recommendation of public censure. King also sought a clarification by this court as to whether the panel's recommended discipline included the outstanding balance owed to Metropolitan Court Reporters in connection with the PRIDE litigation.

After a review of the record before this court, we agree with and adopt the panel's findings, conclusions, and recommendations. As a point of clarification, we are not requiring the respondent to pay the balance owed the court reporters. We were informed during oral argument that the reporters have filed suit against respondent for the amount owed and that litigation is ongoing.

IT IS THEREFORE ORDERED that Gregory B. King be suspended from the practice of law for a period of one year in accordance with Supreme Court Rule 203(a)(2) (1992 Kan. Ct. R. Annot. 153) for his violations herein.

IT IS FURTHER ORDERED that Gregory B. King reimburse PRIDE the sum of $2,000 in accordance with Supreme Court Rule 203(a)(5).

IT IS FURTHER ORDERED that Gregory B. King shall forthwith comply with Supreme Court Rule 218 (1992 Kan. Ct. R. Annot. 176).

IT IS FURTHER ORDERED that this order be published in the official Kansas Reports and that the costs of the proceeding be assessed to the respondent.